**Paul R. FINCHER, Plaintiff,**

v.

**FORD MOTOR COMPANY, Defendant.**

**Civ. A. No. 73S-173(R).**

United States District Court,
S. D. Mississippi, S. D.

Aug. 19, 1975.

Terrell Simpson, Poplarville, Miss., for plaintiff.

David Cottrell, Jr., Gulfport, Miss., for defendant.

## OPINION

DAN M. RUSSELL, Jr., Chief Judge.

Paul R. Fincher, an adult resident citizen of Pearl River County, Mississippi, filed this diversity action against Ford Motor Company, a non-resident corporation, having a registered agent for service of process in Mississippi. Plaintiff's action on account of personal injuries received when his tractor started up in gear and ran over him is based on strict liability in tort and on ordinary negligence.

The case was tried to the Court without a jury.

Certain general facts, as developed by the evidence, are not in dispute.

Plaintiff, on January 3, 1963, purchased a new Super Dexta 2000 three cylinder tractor, Serial No. 09B72–4224, from Hawthorne Ford Tractor of McNeill, Mississippi for the sum of $2,700.-00 plus sales tax. This tractor had been manufactured in England by Ford of England, an English corporation, which sold it in 1962 to Ford Motor Company, Dearborn, Michigan, hereinafter called Ford. Ford sold the tractor to Southern Tractor Sales of New Orleans, Louisiana, which in turn sold it to Hawthorne, the retail dealer from whom plaintiff purchased the tractor. Plaintiff, a skilled millwright by trade, had moved from Texas to Pearl River County for health reasons. He was generally familiar with tractors, having operated tractors manufactured by Ford, Massey-Ferguson and International. After the purchase of the Super Dexta, he became familiar with other type tractors, such as those made by Allis-Chalmers, Case and Oliver. He owned and operated the Super Dexta from the date of his purchase to the date of his injury, September 23, 1967, during which time he used it on weekends in and about his 40 acre farm, and to cut hay for nearby farmers, for which he was paid.

On September 23, 1967, Fincher drove the tractor to a field where he expected to cut hay. His wife transported him back to his home to get some tools and diesel fuel. On returning to where he had left the tractor parked, he attempted to start it by standing on the left side of the tractor and reaching across two gear levers, one a main lever and the other secondary. As he mashed on the starter button, the engine started, and the tractor, being in gear, lurched forward dragging plaintiff under its left rear wheel. Plaintiff sustained severe and crippling injuries, including a crushed pelvis, requiring hospitalization from September 23 to December 18, 1967. He remains crippled, continues to suffer pain, and his injuries, coupled with emphysema, have totally disabled him to perform any type of work. Plaintiff was 53 years old at the time of his accident.

In his complaint, plaintiff alleged that all tractors which he had previously operated would not crank while in gear. He charged that the Super Dexta tractor was unreasonably dangerous and unsafe for its ordinary and intended use because of its capacity to crank while in gear. Plaintiff specifically charged that Ford failed to use reasonable care to design and produce the tractor so that it

would not start while in gear, and failed to adequately warn plaintiff that it would start in gear.[1]

Although plaintiff was available to testify at the hearing, in view of his advanced stage of emphysema and physical condition, the parties stipulated to offer his deposition, taken in April, 1972, into evidence in order to shorten the length of time he would otherwise be on the stand. The Court has reviewed it as well as his testimony.

At the time of his purchase in January, 1963, Fincher had made up his mind to buy a Ford tractor, rather than any other kind. He did so without a demonstration, and Hawthorne delivered the tractor to plaintiff's brother-in-law who had a dairy in Hancock County, Mississippi adjacent to plaintiff's 40 acres in Pearl River County. Fincher admitted receiving a Dexta and Super Dexta Operators Handbook containing instructions on how to operate and maintain the tractor, but denied that it contained any warning about starting in gear. On the day of delivery, he cranked the engine only. Afterwards he and his brother-in-law used the tractor to plow approximately 90 acres of their respectively owned land. In the nearly five years of ownership and use, Fincher customarily started the engine in one of two ways: after first turning a key to activate the starter switch, he pressed the starter button with the main gear in neutral or he depressed the clutch while seated on the tractor; either way, the main gear was not engaged. He did not remember that the operating manual called for starting the vehicle while the main gear was in neutral and with the clutch depressed. He did not recall red warning lights that came on when he turned the starter key to the "on" position. He usually left the key on "on", as it was not necessary to turn it to "off" to stop the engine, explaining that it was

necessary to turn the key on in starting the engine only if he had not left the key on "on", which he frequently did. Other than an initial servicing by Hawthorne, the dealer, and the replacement of the clutch at least three times by Hawthorne and another tractor dealer, Fincher performed his own maintenance of greasing, fueling and cleaning. As to what happened immediately prior to his injury, the following is quoted from his deposition:

"Q. When did you first realize this tractor would start in gear?

"A. Well, I didn't actually know that it would start in gear. Now, all Fords that I ever fooled with wouldn't start in gear. Now, this one, being a diesel . . . I never was instructed, and I imagine I never found it in the manual or never read it in the manual . . . I never was instructed by the Ford people or the dealer who sold it to me that the tractor would start in gear.

"Q. Well, did you ever start it in gear?

"A. No sir.

"Q. Well, you just said awhile ago that sometimes you wouldn't put it in neutral when you started it.

"A. I mashed on the clutch.

"Q. Well, you knew then that if you didn't mash on the clutch . . .

"A. Well, if you mashed on the clutch, you disengage all of your gears.

"Q. That's what I say.

"A. Whether it's in neutral or not, if it's in gear, you mash on the clutch, it's the same as if you put it in neutral, even in an automobile or anything else.

1. In a portion of the pre-trial order entered into evidence by stipulation, plaintiff agreed that the only negligence claimed is the alleged negligent design whereby the tractor would start in gear. The Court responds not only to the design issue but to the alleged failure to warn as well.

"Q. Sure. Now, when was the first time that you discovered that it would start in gear?

"A. When it run over me.

"Q. That was the first time that you knew about it starting in gear?

"A. Yes. I didn't have any idea that it was in gear at that time. It was my . . . customary that I . . . parked the tractor, to put everything in neutral.

"Q. Well, couldn't you see the position of the gears, to tell whether or not . . . . .

"A. Well, probably I didn't pay that much attention to it at that time. The man was fixing to open the gate and I had about forty acres of hay to cut, and my mind was on what I was going to do, and maybe I didn't pay any attention to where the shift lever was.

"Q. Were you standing on the ground?

"A. Yes sir.

"Q. And which side of the tractor were you on?

"A. I was standing on the right-hand side . . . the left-hand side of the tractor. The tractor was facing the gate . . . I was standing on this side (Gesturing).

"Q. You were standing on the left-hand side of the tractor, as the tractor faced the gate?

"A. Yes sir.

"Q. And the switch was on the opposite side from you?

"A. That's right and the starter was too."

Later in his deposition he said he *assumed* the gear was in neutral. Still later, he denied that he had ever started the tractor before from a standing position. In his testimony at the trial, Fincher admitted that, previously to the date of the accident, he had started the engine while standing on the ground. On the day of his accident, he had done so by reaching across the gear levers to hit the starter button, but again he did not remember whether he had left the tractor in gear, inadvertently knocking the main gear lever into gear when he reached across to depress the starter button or when he drew back from pressing the starting button. As to the latter, he thought not, as he did not remember any noise which would have come from engaging a gear lever. He also admitted that he usually started the tractor while in the driver's seat. He could not explain why he had not done so at the time of his accident. Nor did he have the brakes on, explaining that the tractor was in a depression in the road.

Representing Ford at the trial was Donald J. Campbell, a senior engineer in Ford's tractor operations. Plaintiff called him as an adverse witness. Campbell stated that the tractor purchased by plaintiff was manufactured until 1963 only in England by a separate Ford corporation. It was a three cylinder, diesel powered, all purpose tractor, selling at retail from $500.00 to $700.00 less than a comparable American made Ford tractor, Model 600, and was imported by defendant to meet other overseas imports. He attributed the lower cost of the English model to lower wages in England than in the United States. The starting procedure for both the Super Dexta and Model 600 was the same —that is, to check that the main gear lever was in neutral before turning the starter switch key, and to depress the clutch pedal before pushing the starter button or lever downwards. He admitted that the English model could be started in gear whereas Ford's Model 600 since 1939 had been equipped with a mechanical starter switch mounted in the transmission housing with a plunger to go through gates before contact, preventing the engine from starting in gear. He further admitted that the Super Dexta operating manual contained

no specific warning that it could be started in gear, and, as to the safety feature on Ford's Model 600, which he referred to as an interlock system, he said the component parts would cost from $14.00 to $20.00.

Dr. Charles David Veal, with a doctorate from Clemson University, was offered as plaintiff's expert witness. He stated that he had had five years of academic study in machinery design, and had had considerable teaching experience in machinery design, but none related specifically to tractors. It was his opinion with regard to the design of machinery in general that the first consideration is to design machinery to accomplish its functional purposes, then to have controls for ease and safety of operation. He expressed familiarity with the Super Dexta tractor, acknowledging that it had no safety system to protect against its starting in gear, whereas Ford models, copyrighted in 1943, 1952 and 1958, all provided for mechanical or trigger systems which would prevent such. He acknowledged that in the middle 1960's, the mechanical starting systems were abandoned by all manufacturers, when electrical systems were introduced. While admitting that all operating manuals of the various tractor manufacturers provide that the starting procedures begin with gears in neutral, and brakes on, he said that no one goes through all of these instructions and that it was a common practice for farmers to start the engine while standing on the ground. He added that ordinary maintenance or the changing of a clutch would not reveal the presence or absence of the mechanical safety system. At the same time he admitted that no electrical starter systems were in use prior to 1962. Aside from Ford's mechanical system prior to 1962 he did not know of any other manufacturer which used an interlocking, or mechanical safety switch prior to 1962, and no English tractors which used such a system except Massey-Ferguson. It was also his opinion that one, whether a millwright or not, who had owned a tractor for over four years would know whether or not his tractor would start in gear.

The remainder of plaintiff's evidence consisted of medical depositions and of plaintiff's hospital and doctor bills.

Defendant offered Dr. John L. McVay, a member of the Agricultural Extension Department of Mississippi State University at Starkville, Mississippi, who stated that he had had 24 years' experience in tractor maintenance and safety. He is a registered agricultural engineer. He pioneered in teaching tractor safety and operational skill to 4-H Club members throughout the state. He professed familiarity with most tractors used in Mississippi during the last 20 years, including the Dexta manufactured by Ford in England, starting in 1958, and its later model, the Super Dexta which came out in 1962. He described the latter as a small two-row, diesel fueled tractor with a low profile, comparable to similarly small tractors manufactured by Ford in this country and by International Harvester and John Deere, the three largest manufacturers, and also by Case, Moline, Oliver and Allis-Chalmers. Prior to 1963, none of these light models, except Ford, had interlocking starter systems. The Super Dexta had the same safety features as incorporated in most other tractors, and a distinctive brake lock. He admitted that if the starter switch were turned on, evidenced by a small, red light, the Super Dexta could be cranked by hand by one standing on the ground, but, prior to Fincher's case, he had never heard of an accident involving a Super Dexta. In 1963, its starter and ignition system was not unique, but was the same as that used by all manufacturers except Ford, Ford having the only small tractor with a safety ignition system. In his opinion the Super Dexta was a dependable, durable, safe tractor, equal to the best. McVay expressed familiarity with the voluntary assumption of safety standards by manufacturers of agricultural machinery. He stated that

the standards for interlocking switches were adopted in 1969, and revised in 1972. No industry-wide standards existed prior thereto. He said that beginning safety programs involving farm machinery were emphasized between 1958 and 1964, but that only since the adoption of interlock switches in 1969 had all tractors incorporated them as safety devices. Under cross-examination, McVay, having read from the Super Dexta operating manual the instructions on how to start the engine when cold, and when warm, and the list of "do's" and "don'ts", conceded that these instructions contained no warning not to crank the engine in gear, but said that this manual was comparable to others and none, when this tractor was manufactured, contained such warnings. The important thing to remember, he said, was that the instructions to put the gear shift in neutral and to depress the clutch before starting the engine assumed that the operator was in the driver's seat. He conceded that he had seen persons start a tractor from the ground but said that it is not a desirable practice. He pointed out that in recent years, safety practices having become progressive, more emphasis is put on safety in current manuals, and that there are more safety devices that did not used to exist just as in automobiles, giving as examples power steering, power brakes, automatic transmissions, and safety-frames. He predicted that tractor cabs will eventually have compulsory roll-over frames.

Ray Hawthorne, in 1963, was associated with his uncle in the Hawthorne Ford Tractor Agency and remembered the sale of a Super Dexta to Fincher. He said that their agency sold from 100 to 150 Super Dextas in Pearl River County. He was familiar with other type small tractors in the 35 to 38 horse-power class, and said none but the domestic tractors made by Ford had interlocking ignition systems. He stated that the Super Dexta was a fine, economical tractor, selling for as much as $1000.00 less than domestic tractors. The practice at the agency was to distribute to each purchaser an operating manual and to probably give a demonstration. He did not recall that any particular warning was given that the tractor would start in gear, but he also said that it was common knowledge in the area that the Super Dexta, as well as other tractors, would start in gear.

Campbell, previously called by plaintiff as an adverse witness, was defendant's last witness. He stated that the English made tractors were first manufactured in 1958, were exported to the United States in 1961 in competition with other foreign made tractors, and that Ford dealers in this country sold 25,000 Super Dextas up to 1965. He described the configuration of the Super Dexta as an all-purpose, straddle mount, equipped with a low hood, low driving seat, and low wheels, giving it a low center of gravity and making the tractor easier to operate and to mount—easier than trying to start it from the ground on the side away from the controls. He said the isolation starter switch, which, when activated, was accompanied by a red light, and the separate ignition switch, both of which were placed on the right side of the engine, away from the side most operators mount the tractor from, were in themselves safety measures. The tractor also had a clutch, which disengaged the gears, and a simple means of latching the brakes, setting the brakes being recommended before cranking the engine and putting it in gear. From the driver's seat, whether or not the main gear shift was in neutral, was an open and obvious condition. In his research preparation for this case, he determined that in 1963 the only comparably sized tractors with a safety ignition system that would prevent starting in gear were the defendant in its domestically made tractors, and Massey-Ferguson, an English manufacturer. All other makes could be started in gear. He added that the Super Dexta had been sold throughout the world and that the defendant had not received a sin-

gle complaint about its starting in gear. This witness further testified that tractor design was in a state of flux between 1960 and 1965, with manufacturers being slow to utilize design changes without first conducting extensive testing, and that to convert the Super Dexta starting system to one that interlocked would not have been a simple task, but would have required a different design and testing, not limited to the simple addition of small parts. Finally, he stated that Moline did not convert to an interlocking system until 1964, John Deere and International until 1965, and Allis-Chalmers until 1967.

Prior to the trial of this case, the defendant, in a motion for summary judgment, denied that it was the manufacturer of the tractor purchased by plaintiff, as Ford of England was, not herein named as a defendant, and also pled the Mississippi six year statute of limitations on the ground that more than six years had elapsed from the purchase date, January 3, 1963, and/or from such time as plaintiff knew or should have known that the tractor would start in gear, up to the date suit was filed on August 6, 1973. At the close of plaintiff's evidence, and at the completion of the trial, defendant renewed these assertions in a motion for a directed verdict, as well as the contention that at the time this tractor was manufactured, it was without defect and was reasonably safe for its intended use. The Court denied defendant's motion for summary judgment as to the statute of limitations on the grounds that at that time the Court had before it plaintiff's deposition in which he said his first knowledge that the tractor would start in gear was when it ran over him.

On the applicability of the Mississippi statute of limitations, Judge Thornberry in *Alabama Ry. Co. v. Allied Chemical*, 5 Cir., 467 F.2d 679, distinguished the Mississippi cases of *M. T. Reed Construction Co. v. Jackson Plating Co.*, 5 Cir., 222 So.2d 838, and *Wilder v. St. Joseph Hospital*, 225 Miss. 42, 82 So.2d 651, relied on by defendant, from the case before him, holding that the plaintiff railroad company had no opportunity to know, nor should it have known, of a defective wheel prior to the derailment of plaintiff's train. In view of this decision, this Court found that plaintiff's contention here not only raised factual issues as to the merits of the case, but as to the time when the limitations statute should apply, and accordingly denied the motion. As to defendant's motion for a directed verdict during and at the conclusion of the trial, the Court reserved judgment.

Plaintiff, in his post-trial argument, has limited his charges to two specifics — (1) the failure of the defendant to design the Super Dexta so that it would not crank in gear, and (2) defendant's failure to warn the plaintiff of such "defect".

Professor John Wade in his article, "On the Nature of Strict Tort Liability for Products", Mississippi Law Journal, Vol. 44, No. 5, page 841, concludes that in improper design cases there is little difference between the action for strict liability and the negligence action. He continued: "This is true, at least, for the manufacturer, who normally either knows of the danger the design creates or should know (i. e., is negligent in not knowing of it); it is less true of a supplier, who may take the product from the manufacturer without inspecting it in detail. Under design is included the failure to provide proper safety devices. Design may include the part or elements which do or do not go into the make-up of a product, if it is intended to be in that condition." To this Professor Wade adds: "The absence of appropriate warnings or instructions is sometimes classified as a 'design defect'."

As to proof, the Court is aware that there is a distinction between the proof required, on the one hand under "strict liability" and on the other hand for

"negligent design." In *Ward v. Hobart Manufacturing Company*, 5 Cir., 450 F. 2d 1176, Judge Gewin of the Fifth Circuit Court of Appeals found that in the former it is only necessary to prove that the product was defective when it left the manufacturer's hands so that negligence need not be proved, and that there was no substantial change in the product from the time of manufacture until it reached the consumer. He also listed the basic elements of a traditional negligence action.

There is no longer any doubt but that Mississippi has adopted in *State Stove Mfg. Co. v. Hodges*, 5 Cir., 189 So.2d 113, the strict liability standards appearing in Section 402A of the American Law Institute's Restatement of Torts, 2d, which states:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

Applying those standards in *State Stove*, the Mississippi court absolved the manufacturer from liability because the defective hot water heater did not reach the consumer in the undefective condition in which it was sold, but found liable the defendant contractors who defectively installed the heater.

In a later case, *Shainberg Co. of Jackson v. Barlow*, 5 Cir., 258 So.2d 242, the same court, applying the same standards, relieved the retailer of liability because a shoe, defectively manufactured, was sold by the retailer exactly as it came from the manufacturer, and its defect, being latent, was not discoverable by the retailer. In both cases, the court found the product defective, in one the hot water heater, and in the other a shoe. In *Shainberg*, the court additionally found that the defect in the shoe was also not one discernible by the consumer plaintiff.

In the case sub judice, defendant Ford sold the Super Dexta to one of its dealers for ultimate sale to the plaintiff in the same, unchanged condition that it was in at the time of its manufacture. The record is void of any fact to the contrary. Plaintiff has not sued the manufacturer, Ford of England. Ergo, under the reasoning of *State Stove* and *Shainberg*, no liability can attach to the defendant Ford, unless the starting ignition system is found to have been defective, and that the alleged defective condition was known to the defendant, seller, but not readily discoverable to the plaintiff, coupled with the further duty on the part of the defendant to have corrected same or adequately warned of the Super Dexta's capacity to start in gear, if such warning could be deemed sufficient and necessary to cure the claimed defect.

Having posed the issues confronting the Court, it is obvious that the Court must at the threshold determine if the fact that a tractor, manufactured no later than 1962, would start in gear constituted an inherently dangerous defect, even though otherwise serving the purpose for which it was intended, and before liability may be imputed to Ford, not as the manufacturer, but as the seller.

On the foregoing evidence recited in this case, the Court does not find that the fact that the Super Dexta would crank in gear was a defect in the ordinary sense of the word. The tractor performed as it was intended to. Unlike the Ford tractor involved in *Ford Motor Company v. Matthews*, 5 Cir., 291 So.2d 169, relied on by plaintiff, which had a starter safety switch which was designed to prevent its starting in gear, but which failed due to a defective safety switch, the Super Dexta purchased by plaintiff was not designed to include a safety switch. Although Judge Gewin in *Ward v. Hobart Mfg. Co.*, supra, dealt only with the alleged negligence in the design of a meat grinder and the alleged negligence of the manufacturer in failing to warn of the danger involved in the use of a grinder, without a protective device over the auger of the grinder, akin to the negligence charged here, it seems to this Court that the factors considered by Judge Gewin in a straight negligence case would apply as well to the doctrine of strict liability. He found that in the consideration of whether or not a product was reasonably safe in its design that the design must be measured against objective standards. Those most frequently applied he listed as: (1) the conformity of the design to the practices of other manufacturers in the industry *at the time of manufacture*; (2) the open and obvious nature of the alleged danger, and (3) the extent of the plaintiff's use of the product and the length of time involved in such use by the plaintiff and others prior to the injury without any harmful incident. Applying these standards to the instant case, the proof is incontrovertible that the design of safety features between 1960 and 1965 which would prevent tractors similar in make and model to the Super Dexta from starting in gear was in a state of flux and had not been incorporated in a majority of such tractors, manufactured abroad or in the United States, by the year 1962, the latest year in which plaintiff's tractor

could have been manufactured in order to be sold to plaintiff in January of 1963. To establish by hindsight what should have been a reasonably safe design is not the test. As to the second factor, all manufacturer's operating manuals having to do with starting instructions assumed that the operator would activate starting procedures from the seat of the tractor, not standing on the ground on the side of the tractor away from the controls. Obviously, the foreseeability in 1962 that operators would activate the starting mechanisms from the ground was the exception, inasmuch as Ford was the only manufacturer to have incorporated in its design a preventative, interlocking safety device by the year 1963. In *Matthews*, supra, the decedent, standing by the side of his Ford tractor, activated the starting system while the tractor was in gear, knowing that he could rely on a safety switch which failed. This is a different situation from the case at hand. The Court finds it incredulous that plaintiff, during his nearly five year ownership and operation of the tractor, and his professed familiarity with other tractors, had not become aware of the fact that his Super Dexta would start in gear. The Court agrees with plaintiff's own expert that the operator of a tractor over such a period of time would have learned whether the tractor would crank in gear, in which event it is immaterial whether or not the capacity to crank in gear was evident from a visual inspection. According to plaintiff's own practice, he customarily, from the driver's seat, and before cranking the engine, saw that his main gear lever was in neutral, and that he had depressed the clutch. On the times that he started the engine standing on the ground, he obviously had left or put the main gear shift in neutral inasmuch as his accident of September 23, 1963 was the first time his tractor had lurched forward. It is clear to the Court that he left the tractor in gear when he went to get his tools, and, in a moment of forgetfulness,

failed to return the gear lever to a neutral position, or inadvertently hit the gear lever when he reached across the span of the tractor's engine to depress the ignition device. Finally, in connection with the third factor, the evidence is uncontradicted that no claim, other than plaintiff's had ever been reported to the defendant arising out of the Super Dexta's cranking while in gear during a period from 1962 to 1973 when this suit was filed. Nor does the Court find that it was the practice in the industry to contain warnings of the possible results of starting a tractor while in gear. The emphasis on product safety in 1962 did not encompass the scope and breadth of product safety demanded today by the consumer public.

In view of the Court's above findings and conclusions, the only remaining concern is whether the defendant Ford which sold the tractor, ultimately purchased by plaintiff in the same condition as when it left the hands of the manufacturer, can be held liable because of Ford's recognition of the desirability of incorporating an interlock starting system in its own design and manufacture. To state the issue another way, was Ford obligated to alter the Super Dexta to the extent of adding a similar type mechanical device? The Court thinks not. To begin with the Court would have to assume Ford would have authority to do so from its affiliated but separate corporate counter-part in England. The record is void of any such authority. In a final analysis, to find a duty to alter or warn in the absence of authority to Ford to do so, would be over-reaching.

On the basis of the above findings of fact and conclusions of law, the Court finds that plaintiff's action must be dismissed.

An appropriate order may be submitted, with court costs taxed to the plaintiff.