**Ronald and Becky CONNALLY, Plaintiffs,**

v.

**SEARS ROEBUCK AND COMPANY, et al., Defendants.**

**No. Civ.A. 97–1133–CB–C.**

United States District Court, S.D. Alabama, Southern Division.

Oct. 12, 1999.

David G. Wirtes, Jr., Robert T. Cunningham, Jr., George McCormick Dent, III, Cunningham, Bounds, Yance, Crowder & Brown, Mobile, AL, for Plaintiffs.

Joseph P.H. Babington, John T. Dukes, Helmsing, Sims & Leach, Mobile, AL, Adam K. Peck, Melody L. Hurdle, Lightfoot, Franklin & White, Birmingham, AL, for Defendants.

### OPINION and ORDER

BUTLER, Chief Judge.

This matter is before the Court on a joint motion for summary judgment filed by defendants Sears Roebuck and Company ("Sears") and Emerson Electric Company ("Emerson") (Doc. 62). After careful consideration of all issues raised and all relevant documents and evidence presented in light of the applicable law, the Court finds that the motion for summary judgment is due to be granted.

### I. Findings of Fact

On March 6, 1996, plaintiff Ronald Connally severed the nerve in his right thumb while using his new band saw to make practice cuts in pieces of wood. Connally had purchased the saw, which was manufactured by Emerson, from Sears the day before the accident. Connally's stepfather assembled the saw for him, and Connally had read the owner's manual.

On the day of the accident, Connally was working with the saw on the floor of his garage. It was midday, both garage doors were open to allow sunlight in. Connally's three-year-old son was playing outside in the yard. After his second or third cut, Connally removed the workpiece from the saw, leaving the working portion of the blade exposed and the area in front of the blade empty. Connally turned his back to pick out a new piece of wood but left the saw on with the blade running. With his back to the saw, Connally chose the new piece and marked it. When he turned back toward the saw, Connally saw his son's hand by the blade. When he moved his son's hand, Connally's thumb caught the blade.

In his deposition, Connally testified that he read the owner's manual and understood the safety precautions contained in it. He read and understood the warning to keep his hands away from the moving blade, the warning about how to set the blade, and the warning to keep children away from the saw. Connally also read and understood the warnings that were printed on the blade of the saw.

The band saw Connally purchased is a woodworking power tool. The blade of the saw consists of a continuous metal band which circulates in one direction. Only a small portion of this blade—that portion which is meant to contact and cut the wood—is ever exposed. The remainder of the blade circulates through and is enclosed within the housing of the band saw. There is an adjustable blade guard designed to cover the workpiece so that just enough room is left to allow the workpiece to pass beneath the guard and only a minimal portion of the blade will be exposed. The owner's manual instructs the user to adjust the blade guard accomplish this result.

The band saw at issue here is UL-listed, meaning that Underwriters Laboratories has certified the tool as being in compliance with the applicable safety standard. The guard design used on this model is used by every band-saw manufacturer. Approximately 45,000 band saws of this model have been sold, and the manufacturer is aware of no accidents except this one.

The owner's manual included with the band saw contain numerous warnings set out in separate text boxes throughout. Pages two through four contain nothing but warnings and safety instructions. At the beginning, highlighted warnings instruct the operator: "Keep fingers away from the moving blade" and "Adjust upper guide to just clear the wood." Owner's Manual p. 2. Also, the manual states: "KEEP CHILDREN AWAY: Keep all visitors at a safe distance from the saw. Make sure all bystanders are clear of the saw and workpiece." *Id.* p. 4. A warning box states: "Don't let familiarity cause a careless mistake. A careless fraction of a second is enough to cause a severe injury." *Id.* The manual also warns: "To avoid injury from accidental contact with moving parts, don't do layout, assembly or setup work on the saw while any parts are moving." *Id.* p. 16. And, the manual states in bold: **"Before removing loose pieces from the table turn saw off and wait for all moving parts to stop.".** *Id.* p. 17. Some of these warnings are reproduced on the saw itself.

Plaintiff has enlisted the aid of two experts—George Greene and Charles Benedict—who offer purportedly safer alternative designs to defendants' band saw. Greene proposes that an extra piece of plastic be placed over the exposed portion of the blade. This plastic would be connected to a foot pedal which, in turn, is wired to the saw's power switch. If the foot pedal is not depressed the saw is off and the entire blade is shielded as it sits motionless. When the foot pedal is depressed, the saw is turned on and the plastic flap is raised, exposing the moving saw blade so as to allow contact with the workpiece. As long as the machine is running, a portion of the blade is exposed, just as it is with the defendants' current model. Greene has never physically tested his design.

Benedict has developed two alternative designs. The first experienced problems because it hung up on certain cuts and interfered with the normal operation of the band saw. In response to the criticisms of defendant's expert, Benedict then developed a second design, which was excluded from use in this case because it was not timely disclosed.[1] In addition, Benedict states that the guard used on a scroll saw could have been used on a band saw and would have prevented Connally's injury. Benedict has not, however, done any analysis or testing or developed a prototype of such a design.

---

1. The reasons for this exclusion are set forth in detail in Magistrate Judge Cassady's order dated October 13, 1998, which was appealed by plaintiffs and affirmed by the undersigned.

As a result of the accident, Ronald Connally and his wife, Becky, both of whom are Alabama residents, brought the instant products liability action in the Circuit Court of Mobile County, Alabama, against out-of-state defendants Emerson and Sears. Defendants removed the action to this Court, asserting diversity jurisdiction under 28 U.S.C. § 1332. In the complaint, Ronald Connally asserts claims against the defendants under the Alabama Extended Manufacturers Liability Doctrine (First Cause of Action), as well as claims for negligence (Second Cause of Action) and wantonness (Third Cause of Action), all of which arise under Alabama law. In addition, Becky Connally asserts claims for loss of her husband's consortium (Fourth, Fifth and Sixth Causes of Action) each arising from one of the separate theories of liability asserted in the first three causes of action.

## II. Conclusions of Law

At first glance, from the lengthy briefs and voluminous evidentiary submissions, the issues raised summary judgment appear complicated. In fact, they are very simple.[2] First, is proof of a safer alternative band saw design a prerequisite to recovery under each cause of action asserted by plaintiffs? If so, have plaintiffs presented admissible evidence from from which a factfinder could conclude that a safer alternative design exists?[3] Before addressing these issues, it is instructive to review the analysis the Court must apply when considering a motion for summary judgment.

### A. Summary Judgment Analysis

#### 1. In General

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). Once the moving party has satisfied his responsibility, the burden shifts to the nonmoving party to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH–Siegen,* 965 F.2d 994, 999 (11th Cir.1992), *cert. denied,* 507 U.S. 911, 113 S.Ct. 1259, 122 L.Ed.2d 657 (1993) (internal citations and quotations omitted).

The factual disputes raised by the nonmoving party must be both *material and genuine.* "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). " 'Genuine

---

2. Plaintiffs have simplified the issues somewhat by abandoning their claims that defendants should alternatively be held liable on a failure-to-warn theory and proceeding solely on a theory of defective design. Pl.'s Brf. p. 25.

3. The parties agree that the success of loss of consortium claims asserted by plaintiff Becky Connally are dependent upon the success of her husband's claims under AEMLD, negligence and wantonness. Pl.'s Brf. p. 3; Def.'s Brf. pp. 35–36. *See also Carpenter v. McDonald,* 495 So.2d 640 (Ala.1986).

disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record.' " *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir.1996) (quoting *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 918 (11th Cir.1993)).

### 2. Alabama Products Liability

Although under Alabama law a jury ordinarily evaluates a plaintiff's claims that a product is defective, there are instances where summary judgment is appropriate. *Elliott v. Brunswick Corp.*, 903 F.2d 1505, 1507 (11th Cir.1990). This is especially true when an ordinary consumer understands that a product is inherently dangerous. "Some products by their nature (or, in modern parlance, by their conscious design), place both users and bystanders in some measure of danger. A knife or an axe may cut persons, as well as their intended targets. Fish hooks can wound; *saws can maim*, ... Yet ... we do not hold manufacturers liable simply because the use of their products involves some risk[.]" *Id.* (emphasis added).

### B. Must Plaintiffs Offer Proof of a Safer Alternative Design?

■ A manufacturer is liable for injuries resulting from an inherently dangerous product, such as a saw, only if the plaintiff can prove "that a safer, practical, alternative design was available to the manufacturer at the time it manufactured the [product]." *Beech v. Outboard Marine Corp.*, 584 So.2d 447, 450 (Ala.1991). This is true whether plaintiffs' defective design claim arises from AEMLD, negligence or wantonness. In *Veal v. Teleflex*, 586 So.2d 188 (Ala.1991), the plaintiffs alleged that the court erred when it instructed the jury in a design defect case as to AEMLD but refused to instruct as to negligence and wantonness. In addressing this contention, the Alabama Supreme Court traced the history and purpose of AEMLD as a negligence- or fault-based concept:

A manufacturer's failure to achieve its full potential in design and thereby forestall unreasonable danger forms the basis for its strict liability in tort. It is a liability whose essence parallels the lack of due care that is the essence of its liability for negligence. It may be seen, therefore, that in cases involving deficient design, foreseeability is merely scienter under another name.... Since the issue is whether ... [defendant] put into circulation a product unreasonably dangerous for use and since the unreasonableness of the danger must be determined by the potential available to the designer at the time of design, *it is apparent that the strict liability and negligence claims merge.*

*Id.* at 190 (quoting *Casrell v. Altec Industries, Inc.*, 335 So.2d 128, 131 (Ala.1976)) (internal citations omitted) (emphasis added). Thus, the *Veal* court held that because the liability for defective design, whether under AEMLD, negligence or wantonness, arises from placing an unreasonably dangerous product on the market, the court did not err when it instructed the jury only as to AEMLD. *Id.* at 1508. Similarly, other courts, following *Veal,* have held that AEMLD and negligence claims based on defective design are indistinguishable. *See Wakeland v. Brown & Williamson Tobacco Corp.*, 996 F.Supp. 1213 (S.D.Ala.1998); *Pitts v. Dow Chemical Co.*, 859 F.Supp. 543 (M.D.Ala.1994).

Plaintiffs argue that they must have three separate causes of action available to them because some Alabama and Eleventh Circuit cases have distinguished among the three. It is, however, a distinction without a difference because no matter which theory a plaintiff proceeds under, he must prove a safer alternative design. *Yarbrough v. Sears Roebuck & Co.*, 628 So.2d 478 (Ala.1993), a case cited by plaintiffs, illustrates this point. In that case, the court discussed plaintiff's AEMLD claims and plaintiff's negligent and wanton design claims separately. However, the extent of the court's discussion of the negligent and

wanton design claims was to point out that those claims failed for the same reason that the AEMLD claim failed—lack of evidence of a safer alternative design. *Id.* at 482.

Even when no AEMLD claim is involved, a plaintiff is nonetheless required to prove the existence of a safer alternative design. In *Richards v. Michelin,* 21 F.3d 1048 (11th Cir.1994), the plaintiff brought negligent and wanton design claims under Alabama law. In response to the former claim, the court held that "[t]o prove defectiveness under Alabama law, a plaintiff must prove that a safer, practical, alternative design was available to the manufacturer at the time it manufactured its product." *Id.* at 1056. As to the latter claim for wanton design, the court held:

> With regard to the wanton design claim, the question we are confronted with is whether [defendant] consciously and intentionally refused to employ available technology (some safer practical alternative design) in reckless disregard of the fact that its failure to do so made the risk [of harm] probable or more likely. *As [plaintiff] has failed to show the existence of a safer practical alternative design, it cannot be said that [defendant] refused to use such a design.* Consequently, insufficient evidence supported [plaintiff's] wanton design claim.

*id.* at 1058.[4]

Finally, plaintiffs bring out the constitutions—both state and federal—arguing that merging common law causes of action for negligence and wantonness into the AEMLD is tantamount to a violation of their rights to trial by jury and access to the courts.[5] Plaintiffs do not elaborate on this argument. Since the issue is what plaintiffs must prove under each theory of liability and whether they have proved it, the Court need not concern itself with the possible constitutional ramifications of the AEMLD.

### C. Safer Alternative Design

#### 1. What is a Safer Alternative Design?

■ Having determined that plaintiffs must prove the existence of a safer alternative design if they are to recover under their defective design claims, the Court must next consider whether plaintiffs have met their burden of proof. To do so plaintiffs must present evidence that:

(a) The plaintiff's injuries would have been eliminated or in some way reduced by the use of the alternative design; and that

(b) taking into consideration such factors as the intended use of the [product], its styling, cost, and desirability, its safety aspects, the foreseeability of the particular accident, the likelihood of injury and the probable seriousness of the injury if that accident occurred, the obviousness of the defect, and the manufacturer's ability to eliminate the defect, the utility of the alternative design outweighed the utility of the alternative actually used.

---

4. Plaintiffs point to a rather confusing footnote in *Richards,* 21 F.3d at 1056 n. 18, as support for their proposition that AEMLD, negligence and wantonness are distinct causes of action. The footnote addressed Richards' argument, based on *Reynolds v. Bridgestone/Firestone, Inc.,* 989 F.2d 465, 470 (11th Cir.1993), that he need not prove a safer alternative design to support his negligent and wanton design claims. In response the *Richards* court distinguished *Reynolds,* stating, "*Reynolds* involved liability for mismatched rim parts under the Alabama Extended Manufacturer's Liability Doctrine and it is therefore inapposite to this case." What

this statement implies, *albeit incorrectly,* is that plaintiff asserting an AEMLD claim need not prove a safer alternative design. It does not support plaintiffs' theory that they can survive summary judgment without proof of a safer alternative design.

5. None of the cases cited above hold that wantonness claims are merged into the AEMLD. Rather, as *Richards* made clear out, it is virtually impossible for a plaintiff who cannot prove negligence in a design defect case to succeed on a wanton design claim, since both require proof of a safer alternative design. *Richards,* 21 F.3d at 1056–58.

*Beech,* 584 So.2d at 450 (quoting *General Motors Corp. v. Edwards,* 482 So.2d 1176, 1191 (Ala.1985)).

### 2. Have Plaintiffs Presented Proof that Such a Design Exists?

■ Defendants contend that plaintiff's expert evidence does not support one or both elements necessary to prove the existence of a safer alternative design. Defendants point out that Greene's design, which involved the use of a foot pedal, would not necessarily have prevented the accident because the blade guard remains up and the blade is exposed as long as the machine is on. Defendants reason that since the accident occurred while the machine was left running, Greene's blade guard would not have made a difference. Furthermore, defendants argue that neither of plaintiffs' alternative design meets the second prong of the test because plaintiffs have no evidence that their design has greater utility than the design used by the defendants.[6] Defendants point out that neither of plaintiffs' experts has offered any testimony regarding the feasibility of their proposed designs and, in fact, neither

has ever even built a prototype or tested their proposed design.[7]

Rather than pointing to evidence that creates a genuine issue of fact as to the existence of a safer alternative design, plaintiffs take a different tack. They simply ignore this requirement altogether and create a new one which, according to plaintiffs, they have evidence to support.[8] Plaintiffs contend that Alabama products liability law requires that a manufacturer comply with the state of the art and that the state of the art for band saws was to have a lower blade guard. In *Frantz v. Brunswick Corp.,* 866 F.Supp. 527 (S.D.Ala.1994), the Honorable W. Brevard Hand addressed the relationship of state-of-the-art evidence to a design defect claim. "Proof of 'state of the art' may be offered by either party as to [the issue of a safer alternative design]. However, showing the 'technical feasibility of a safe design' is insufficient; rather, the Plaintiff must show that the alternative design could be adapted to the existing market." *Id.* at 534 (footnotes omitted). In other words, state of the art without proof of utility (and probability of reducing or eliminating the injury) is meaningless.

---

**6.** Defendants dispute the utility of plaintiffs' design with the opinion of their own expert, Fred Lurwig. Lurwig built replicas of the alternative designs proposed by Greene and Benedict, subjected them to testing and concluded:

> [T]he guards [proposed by Greene and Benedict] hang-up, interfere with the operations performed on band saws, and create hazards in the overall use of the saw. Additionally, the proposed band saw guards interfere with the set-up of the table setting
> . . .
> The proposed band saw guards do not make the saw safer to operate; instead, they raise the level of care required by the operator to use the saw safely. [Greene's] proposed blade guard with two control switches adversely affect[s] the utility of the band saw and introduces hazards that do not otherwise exist.

Lurwig Rpt. p. 5.

**7.** Although defendants have filed separate motions to exclude the testimony of plaintiffs' experts, those motions have not been

considered by the Court. For the purpose of summary judgment, it is assumed that the testimony of plaintiffs' experts would be admissible.

**8.** The closest plaintiffs come to acknowledging their duty to prove a safer alternative design is their general assertion that the band saw is unreasonably dangerous "as contemplated under the AEMLD." Pl.'s Br. p. 17. This assertion is accompanied by a footnote which refers to the expert reports of Greene and Benedict. The quoted portion of Greene's report consists of his conclusory opinion that the saw was unreasonably dangerous and, therefore, defective. Benedict's report is more detailed but similarly replete with conclusions that make no reference to any supporting facts. Although Benedict states that there are safer alternative designs that are economically and technically feasible, he does not point out what those designs are. "[A] party may not avoid summary judgment solely on the basis of an expert's opinion that fails to provide specific facts from the record to support its conclusory allegations." *Evers v. GMC,* 770 F.2d 984, 986 (11th Cir.1985).

In any event, the evidence plaintiffs point to does not support their argument that lower blade guards were state of the art for band saws at the time the saw was manufactured. Plaintiffs rely on evidence from their experts, as well as defendants' witnesses, that lower blade guards were state of the art with respect to *power saws.* As plaintiffs evidence demonstrates, there are many different types of power saws—*e.g.,* scroll saws, table saws, miter saws, radial saws, band saws, etc.—all of which are designed differently and serve different purposes. Evidence that blade guards can feasibly be adapted to some types of power saws does not amount to evidence that they can feasibly be adapted to all others. In fact, the evidence is that no manufacturer had developed lower blade guards for band saws.[9]

### D. Conclusion

Proof of a safer alternative design is an essential element of each cause of action asserted by the plaintiffs. Because they have failed to offer evidence of a safer alternative design for the type of saw that caused Ronald Connally's injuries, the Court must conclude that no such design existed. Consequently, plaintiffs have failed to demonstrate a genuine issue of material fact, and defendants are entitled to judgment as a matter of law. It is, therefore, **ORDERED** that defendants' motion for summary judgment be and hereby is **GRANTED.** Judgment shall be entered by separate order.

---

**9.** *Sears Roebuck & Co. v. Kunze,* 996 S.W.2d 416 (Tex.App.—Beaumont 1999), a case plaintiffs proffer as "squarely on point" is easily distinguishable on this issue alone. *Kunze* involved a radial saw, and the plaintiff had presented evidence at trial that other manufacturers equipped their *radial saws* with lower blade guards.