Ashley ELLIOTT, Plaintiff–Appellee,

v.

**BRUNSWICK**
**CORPORATION, Defendant.**

Appeal of MERCURY MARINE, A DIVI-
SION OF BRUNSWICK
CORPORATION, Defendant–Appellant.

No. 89–7190.

United States Court of Appeals,
Eleventh Circuit.

June 25, 1990.

John W. Clark, Anthony N. Fox, Amy K. Myers, Clark & Scott, P.C., Birmingham, Ala., and Ronald L. Reid, and R. Wayne Thorpe, Alston & Bird, Atlanta, Ga., for defendant-appellant.

Richard D. Stratton and Ben Hogan, III, Hogan, Smith & Alspaugh, P.C., Birmingham, Ala., for plaintiff-appellee.

Before COX, Circuit Judge, and HILL *, Senior Circuit Judge, and SMITH **, Senior Circuit Judge.

HILL, Senior Circuit Judge:

The appellant, a manufacturer of motors for boats, appeals an unfavorable judgment of $4,375,000.00 in this lawsuit based on diversity jurisdiction. At trial, the appellee contended that the appellant should have constructed guards on the propellers that it manufactures, and asserted three theories of recovery: (1) compensatory damages based on alleged negligence, (2) compensatory damages based on alleged product liability under the Alabama Extended Manufacturer's Liability Doctrine, and (3) punitive damages based on alleged wantonness. The jury returned a verdict in favor of the appellee against Mercury in the amount of $1,500,000.00 compensatory damages, and $3,000,000.00 punitive damages. The district court entered a judgment against Mercury in the amount of $4,375,000.00, a sum which reflected a setoff for the amount the appellee received in settlement from other defendants. We reverse.

---

* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable Edward S. Smith, Senior U.S. Circuit Judge for the Federal Circuit sitting by designation.

## FACTS

In July, 1982, the appellee, Ashley Elliott, then fourteen years old, jumped from a pier at night into the water next to a boat; the rotating propeller on the boat's motor, and perhaps the boat's cavitation plate, struck and injured her. Elliott suffered grievous injuries requiring extensive surgery. The appellant, Mercury Marine, designed and manufactured the motor at issue, including the drive mechanism which required a propeller. Consumers generally use boats such as the one involved here, (of the sort often referred to as "planing" pleasure crafts [1]), for skiing, fishing and other recreational activities. At trial, the evidence showed that the boat operator had been drinking, but his conduct is not at issue in this appeal.

## TRIAL PROCEEDINGS

In July, 1983, Elliott filed suit in the Circuit Court of Jefferson County, Alabama against Mercury and several other defendants; most defendants settled with Elliott prior to trial. Elliott contended that Mercury should have constructed a guard around the boat's propeller to protect her from injury. In July, 1988, Mercury and a co-defendant removed this diversity case to the United States District Court for the Northern District of Alabama. The parties tried the case in August, 1988, but after two days of deliberation, the jury failed to reach a verdict as to Mercury, and the court declared a mistrial.

In January, 1989, the parties retried the case, and the court instructed the jury on three theories of recovery: (1) compensatory damages based on alleged negligence, (2) compensatory damages based on alleged product liability under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"), and (3) punitive damages based on alleged wantonness. The jury returned a verdict, and the court entered a judgment for the amount we have already discussed.

Mercury filed a Motion for Judgment Notwithstanding the Verdict or in the Alternative for Remittitur or in the Alternative for a New Trial, which the court denied. This appeal followed.

## DISCUSSION

Mercury now asserts that the district court erred in denying Mercury's motion for both a directed verdict and a judgment notwithstanding the verdict as to the issue of Mercury's liability; Mercury also asserts that the district court erred in denying this same motion on the issue of the punitive damages assessed against Mercury. Mercury also challenges the district court's admission into evidence of a videotape deposition of one of Mercury's attorneys who repeatedly invoked the attorney-client privilege and refused to answer. Likewise, Mercury contends that the district court erred by denying its motion for a new trial, and by allowing the admission of evidence concerning Mercury's wealth. Finally, Mercury asks in the alternative that we enter a remittitur as to the amount of punitive damages that the district court assessed.

## MERCURY'S LIABILITY

The trial court charged the jury in this case on two liability theories, product liability under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"), and negligence. Case law, found in *Casrell v. Altec Industries, Inc.*, 335 So.2d 128 (Ala. 1976), and *Atkins v. American Motors Corp.*, 335 So.2d 134 (Ala.1976), created Alabama's AEMLD. Virtually the same principles apply under either theory.

In *Casrell* and *Atkins*, Alabama, like many states, partially adopted Section 402A of the American Law Institute's Second Restatement of Torts. That Section banished the traditional obstacles of both privity and contractual defenses to product liability claims by changing the nature of the cause of action from contract to tort. Plaintiffs, moreover, no longer needed to

---

**1.** "Planing" means that as these boats increase in speed (up to 20 m.p.h.), they lift themselves

from the water and "plane" on the surface.

prove the seller's lack of due care, since the new action, although based in tort, removed the requirement that the product's defect result from the seller's negligence. Advocates and scholars have divided the new tort into many subparts, but the instant case clearly involves, not an alleged manufacturing flaw, but a manufacturer's alleged conscious decision to design an inherently dangerous product.

With this qualification in mind, we now examine the pertinent Alabama case law. Elliott contends that Mercury's design for its propeller was defective, since it did not provide for a guard to encircle it. In *Casrell*, the Supreme Court of Alabama interpreted "defective" to mean "... that the product does not meet the reasonable expectations of an ordinary consumer as to its safety." 335 So.2d at 133. In *General Motors Corp. v. Edwards*, 482 So.2d 1176, 1191 (Ala.1985), that same court held that if a plaintiff wishes to show that an allegedly dangerous product is defective, he must also prove that a "... safer, practical, alternative design was available to the manufacturer at the time it manufactured the [product]." Mercury contends that Elliott failed to establish either element of her cause of action. We agree.

### 1. *Consumer Expectations Test*

█ As adopted by the Alabama Supreme Court in *Atkins v. American Motor Corp.*, 335 So.2d 134, 147 (Ala.1976), the Second Restatement states that a defective product is one "... dangerous beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Restatement (Second) of Torts, § 402A comment i. Our task today is to determine whether a pleasure boat's unguarded propellers are dangerous beyond the expectations of the ordinary consumer. We conclude that they are not.

Although, under Alabama law, a jury ordinarily evaluates a plaintiff's claims that a product is defective, our review of the pertinent case law convinces us that certain products whose inherent danger is patent and obvious, do not, as a matter of law, involve defects of a sort that a jury should resolve.

In our view, the ordinary consumer clearly understands that a revolving propeller involves danger. "The use of certain products," as the Alabama Supreme Court has noted, has always been "... firmly grounded in common sense." *Entrekin v. Atlantic Richfield Co.*, 519 So.2d 447, 450 (Ala. 1988). In *Hawkins v. Montgomery Industries Int'l, Inc.*, 536 So.2d 922, 926 (Ala. 1988), moreover, that same court held that although a jury must normally assess a plaintiff's allegations that a product is defective, an "exception[ ]" exists when the involved parties "contemplated" the nature of the defect at the time of the accident.

Some products, by their nature, (or, in modern parlance, by their conscious design), place both users and bystanders in some measure of danger. A knife or an axe may cut persons, as well as their intended targets. Fish hooks can wound; saws can maim, and revolving propellers can cause fearful damage. Yet as the Georgia Court of Appeals noted in *Stovall & Co. v. Tate*, 124 Ga.App. 605, 184 S.E.2d 834, 838 (1971), we do not hold manufacturers liable simply because the use of their products involves some risk:

> To illustrate, the manufacturer who makes, properly and free of defects, an axe or a buzz saw or an airplane with an exposed propeller, is not to be held liable if one using the axe or the buzz saw is cut by it, or if someone working around the airplane comes in contact with the propeller.

We hold that the dangers inherent in Mercury's product should have been apparent to, or within the contemplation of, Elliott. Thus, Mercury has not manufactured a defective product within the meaning of the Restatement (Second) of Torts.

### 2. *Available Alternative Design*

█ Elliott vigorously contends that Mercury had access to a safe, practical design for propeller guards "which it could have manufactured and marketed many years in advance of the manufacture of the

engine involved in this lawsuit." Mercury just as vigorously contends that Elliott is unfairly attempting to penalize the company by creating an imaginary duty "to invent" an acceptable propeller guard.

We agree with Mercury that courts cannot burden companies with an immediate duty to revolutionize their industry. Elliott has demonstrated to our satisfaction than an experimental propeller guard, useful for some purposes, existed at the time of her accident. Elliott also argues, however, that we should hold Mercury for its failure to adapt and refine that design into one feasible for use on planing propeller craft. With this we do not agree.

As Mercury has stated, and as Elliott concedes, at this stage neither industry custom, nor the pertinent regulations, dictate the use of propeller guards. Witnesses for both parties indicated that no boat manufacturer, boat motor manufacturer, or boating accessory manufacturer currently offers a propeller guard for planing pleasure boats for the purpose of protecting persons from propeller contact.[2] Moreover, the Federal Boat Safety Act of 1971, 46 U.S.C.A. § 4301, *et seq.*, gives the Coast Guard the exclusive responsibility for establishing safety regulations. The Coast Guard, in its turn, has promulgated a substantial body of boat safety regulations, none of which require or recommend propeller guards.[3]

■ Elliott argues, however, and we agree, that a manufacturer's proof of compliance with either industry-wide practices, or even federal regulations, fails to eliminate conclusively its liability for its design of allegedly defective products. *See e.g., Dunn v. Wixom Bros.*, 493 So.2d 1356 (Ala.1986); *General Motors Corp. v. Edwards*, 482 So.2d 1176, 1198 (Ala.1985). We do not, naturally, dismiss a manufacturer's compliance with industry standards, but we must also remember that those standards may sometimes merely reflect an industry's laxness, inefficiency, or inattention to innovation. As Judge Learned Hand stated in *The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir.1932):

> A whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own test, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission.

In our view, it is difficult to articulate a rule that categorizes, in consistent fashion, those occasions when a court should defer to a manufacturer's compliance with industry standards, and those occasions when a court should fashion new guidelines as to

---

**2.** Certain rescue units in parts of California, as well as in New Zealand and Australia, apparently use propeller guards for life rescue operations conducted in high surf; at one time certain United States Marine Corps landing craft also used them there. Both life rescue boats and military landing craft will, of course, probably be either stationary or slow-moving, since they generally operate in situations where floundering persons may be in the water, near the revolving propeller blades.

In addition, slow-moving passenger boats in amusement parks also use propeller guards. Finally, one propeller manufacturer uses guards to protect the propellers on low-horsepower motors on non-planing fishing boats, since users often take these boats into shallow water containing underwater hazards such as rocks and stumps.

**3.** We also note that the *Report of the Propeller Guard Committee*, prepared by the National Boating Safety Advisory Committee, and presented on November 7, 1989, recommends that the "U.S. Coast Guard ... take *no* regula-

tory action to require propeller guards" (emphasis supplied). The Report reflects the concerns of several of the experts at trial by noting that these "guards present underwater profiles of significantly larger frontal area," thereby increasing the risk of accidental contact with persons in the water. The Report also warns that ring-type guards may catch an arm, leg or other appendage and hold it against the blades of the rotating propeller.

Although the Coast Guard has considered the matter, it has not adopted regulations requiring guards.

We suggest, although we in no way hold, that when the federal government has explicitly declared that its rules and regulations supplant those of a state, a party may at least contend that these regulations supplant pronouncements not only from state legislatures, but from state juries as well. We caution, however, that this suggestion in no way determines our holding today.

what those standards should be. In *this* case, however, we have the opinion of experts to guide us.

At trial, the plaintiff showed the jury a videotape of the boat actually involved in Elliott's accident, with a ring guard affixed to its propeller, and demonstrating a loss in speed of only five miles per hour. At first blush, this demonstration, the highwater mark of the plaintiff's case, was most impressive. On reflection, however, we note that the plaintiff demonstrated only what both parties already had conceded; both parties agreed that it was possible to equip these boats with guards.[4]

At trial, moreover, the experts called by *both* parties agreed that no feasible guard existed that could be adapted readily to existing motors. For example, one of plaintiff's witnesses, Dr. Arthur Reed, a naval architect, estimated that Mercury might develop an appropriate guard after a total of ten or eleven years of effort by biomechanical engineers, hydrodynamic engineers, structural engineers, and materials engineers, followed by an additional four years of prototype testing. Dr. Reed frankly conceded, in short, that, in his view, "all of these guards need technical development before they are ready to really be marketed."

Both parties' witnesses, moreover, testified regarding potential difficulties that these devices might engender. Both groups of experts, for example, testified that the use of these guards can result in a boat's substantial loss of power and speed, due to their added drag. Both parties' experts also testified that ring guards would create handling and steering problems; they stated that these guards, due to their circular shape, add new rudder areas in entirely new planes, thus inducing dangerous handling characteristics. Mercury's experts, moreover, testified that guards could create safety hazards. They stated that some consumers would be likely to remove the guard to gain power and promote fuel economy; a guard's removal

would cause the boat to exceed its power rating, and thus would create handling difficulties.

Both parties' experts also explained that guards themselves can become a danger as they move through the water. Experts from both sides agreed that guards can entrap human limbs, increasing the risks of mutilation, amputation and drowning. One of Elliott's experts acknowledged that if a boat were moving in the 30–35 mph range, a blow to the head by one of its guards would be fatal; he also conceded that serious injuries would occur even at lesser speeds.

In short, although Elliott's experts promoted the use of propeller guards, they agreed that companies could not yet market them for general use. Both sets of experts, moreover, discussed the problems that these devices engender. Elliott's nearest approach to evidence on their utility was her videotape of the boat that struck her equipped with such a guard; Elliott's own experts, however, agreed that a satisfactory guard of this type was not available. Elliott, therefore, failed to produce evidence that Mercury had access to a safe, practical design for propeller guards at the time of her accident.

We do not mean to suggest, by our holding today, that the propeller industry may never design a feasible propeller guard that satisfies the concern mentioned by the experts at trial. Our review of the evidence and testimony, however, convinces us that both current industry standards, and the federal regulations, simply reflect the consensus of experts that the industry's adaption of propeller guards at this point would not only be infeasible, but unwise, unsafe and unfortunate. As a general rule, courts endeavor not to scapegoat manufacturers where challenged designs are "in a state of flux" at the time of manufacture. *Fincer v. Ford Motor Co.*, 399 F.Supp. 106, 114 (S.D.Miss.1975), *aff'd*, 535 F.2d 657 (5th Cir.1976). In this case, moreover, the challenged designs are not

---

4. In fact, had the jurors been able to join the operator *inside* the boat, instead of merely witnessing a videotaped demonstration of his ride, they might have gained greater insight into some of the difficulties generated by the application of these guards.

even in a state of transition; at trial, even experts who promoted these guards agreed that their application was not yet possible. As one court reasoned in *Wilson v. Piper Aircraft Corp.*, 282 Or. 61, 577 P.2d 1322, 1326–27 (1978):

> If liability for the alleged design defect is to "stop somewhere short of the freakish and the fantastic," plaintiff's *prima facie* case of a defect must show more than technical feasibility of a safe design.

\* \* \* \* \* \*

> It is not proper to submit such allegations to the jury unless the court is satisfied that there is evidence from which the jury could find the suggested alternatives are not only technically feasible but also practicable in terms of costs and the over-all design and operation of the project.

Experts have studied this issue, and have stated that no company has as yet developed a feasible guard; they have also expressed serious concerns about its safety. We hold, therefore, that when Elliott failed to demonstrate the existence of a safer, practical propeller guard for use on planing pleasure boats, as required by the Alabama Supreme Court in *Edwards*, she failed to establish a claim under Alabama's Extended Manufacturer's Liability Doctrine. We also hold, for the same reason, that Elliott failed to state a tort claim based on negligence.

### CONCLUSION

Because of our holding on the subject of Mercury's liability, we need not reach the other issues raised in its appeal.

We hold that the appellee failed to show that the appellant manufactured a product defective in the sense contemplated by the Restatement (Second) of Torts, § 402A, and as interpreted by the Alabama Supreme Court.

We therefore REVERSE the judgment of the district court.