**Shannon MOORE, Individually and By Next Friend, Donal R. Moore, Petitioners,**

**v.**

**BRUNSWICK BOWLING & BILLIARDS CORPORATION, Mercury Division, Individually and dba Mercury Outboard Motors and/or Mercruiser; and Vivian Industrial Plastics, Inc., Individually and dba V.I.P. Boats, Respondents.**

**No. D–3997.**

Supreme Court of Texas.

Argued Feb. 15, 1994.

Decided April 20, 1994.

Rehearing Overruled June 22, 1994.

Certiorari Denied Dec. 12, 1994.

See 115 S.Ct. 664.

---

5. Rhodes' allegations are based solely on *oral* misrepresentations and warranties. *See supra*

889 S.W.2d at 240.

Neal H. Paster, Houston, for petitioners.

James B. Lewis, H. Lee Lewis, Jr., Houston, for respondents.

CORNYN, Justice, delivered the opinion of the Court, in which GONZALEZ, DOGGETT, GAMMAGE, SPECTOR and ENOCH, Justices, join.

This case presents the question of whether the Federal Boat Safety Act, 46 U.S.C. §§ 4301–4311, preempts a state law tort claim that a boat was defective because it lacked a propeller guard. We hold that such claims are neither expressly nor impliedly preempted by the Act. Therefore, we reverse the judgment of the court of appeals and remand to the trial court for further proceedings.

On May 4, 1986, Petitioner Shannon Moore was swimming in the San Bernard River in Brazoria County when she was struck by the propeller of a motorboat. The boat was manufactured by Respondent Vivian Industrial Plastics, Inc., (V.I.P.), and contained a motor and drive unit manufactured by Respondent Brunswick Bowling & Billiards Corp., Mercury Division (Mercury). Shannon suffered injuries to her right arm from the propeller, which was not equipped with a guard. Donal Moore, as Shannon's next friend,[1] sued Mercury and V.I.P. in state district court under theories of negligence and strict liability.[2] Moore contended that the motor was defectively designed because it did not include a propeller guard. Mercury moved for summary judgment on the grounds that Moore's products liability suit was preempted by the Federal Boat Safety Act. The trial court granted Mercury's motion, stating in its order that Moore's claims were preempted by federal law. To serve judicial economy, the parties agreed that summary judgment should also be rendered on Moore's identical claims against V.I.P., without the necessity of V.I.P. filing a separate motion. The trial court then granted Mercury and V.I.P.'s motion for severance, whereupon the summary judgment became final for the purposes of appeal. The court of appeals affirmed, agreeing that Moore's claims were preempted. 853 S.W.2d 842.

The doctrine of federal preemption is rooted in the supremacy clause of Article VI of the United States Constitution, which states that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Thus a state law that conflicts with federal law is "without effect." *Cipollone v. Liggett Group, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992). The "ultimate touchstone" of preemption analysis is congressional intent. *Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 1189, 55 L.Ed.2d 443 (1978) (quoting *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103, 84 S.Ct. 219, 223, 11 L.Ed.2d 179 (1963)).

Federal law may supersede state law in different ways. Congress may explicitly state its intent to preempt in the language of a federal statute. *See Hillsborough County v. Automated Medical Labs., Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985). Preemption may be presumed when federal legislation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," or touches a "field in which the

---

1. At the time of the accident, Shannon Moore was a minor. She attained her majority while this suit was pending.

2. Moore also sued the owners and operators of the boat, who are not parties to this appeal.

federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Finally, state law is preempted to the extent it actually conflicts with federal law. State law conflicts with federal law when it is impossible to comply with the law of both, *see Hillsborough*, 471 U.S. at 713, 105 S.Ct. at 2375, or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *International Paper Co. v. Ouellette*, 479 U.S. 481, 492, 107 S.Ct. 805, 811, 93 L.Ed.2d 883 (1987). The term "federal law" in this context includes regulations as well as statutes. *See Hillsborough*, 471 U.S. at 713, 105 S.Ct. at 2375.

To determine whether state law is preempted in this case, we must first examine the history, purpose, and language of the Federal Boat Safety Act. The Act was originally promulgated "to improve boating safety by requiring manufacturers to provide safer boats and boating equipment to the public through compliance with safety standards to be promulgated by the Secretary of the Department in which the Coast Guard is operating—presently the Secretary of Transportation." [3] S.Rep. No. 248, 92d Cong., 1st Sess. (1971), *reprinted in* 1971 U.S.C.C.A.N. 1333, 1333. Before prescribing regulations establishing safety standards under the Act, the Secretary must consult with the National Boating Safety Advisory Council concerning the need for the regulation and the extent to which it will enhance recreational vessel safety. 46 U.S.C. § 4302(c)(4). To pass a regulation compelling substantial future alteration of a vessel or piece of associated equipment, the Secretary must first determine, with the help of the Advisory Council, that the regulation is necessary to avoid a substantial risk of

personal injury to the public. 46 U.S.C. § 4302(c)(3).

The legislative history indicates Congress' belief that uniformity was necessary to achieve the goals of the Act: "The need for uniformity in standards if interstate commerce is not to be unduly impeded supports the establishment of uniform construction and equipment standards at the Federal level." 1971 U.S.C.C.A.N. at 1335.[4] The language of the Act also reflects this desire for some degree of uniformity. Section 4306, entitled "Federal Preemption," provides:

> Unless permitted by the Secretary under section 4305 of this title, a State or political subdivision of a State may not establish, continue in effect, or enforce a law or regulation establishing a recreational vessel or associated equipment performance or other safety standard or imposing a requirement for associated equipment (except insofar as the State or political subdivision may, in the absence of the Secretary's disapproval, regulate the carrying or use of marine safety articles to meet uniquely hazardous conditions or circumstances within the State) that is not identical to a regulation prescribed under section 4302 of this title.

The Act also contains a "savings clause" in § 4311(g), which provides:

> Compliance with this chapter or standards, regulations, or orders prescribed under this chapter does not relieve a person from liability at common law or under State law.

Mercury[5] contends that Moore's claims are expressly preempted by the combination of § 4306 and the Coast Guard's decision not to mandate propeller guards through regulation, as evidenced by a Coast Guard report. In 1988, the Secretary of the Coast Guard instructed the Advisory Council to investi-

---

**3.** The Secretary of Transportation has delegated the powers and duties under the Act to the Secretary of the Coast Guard. *See* H.R.Rep. No. 338, 98th Cong., 1st Sess. 122–23 (1983), *reprinted in* 1983 U.S.C.C.A.N. 924, 934–35; H.R.Rep. No. 154, 100th Cong., 2d Sess. 9 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2361, 2363.

**4.** *See also* Andrew W. Anderson & F. David Famulari, *Practice Guide: Pleasure Boats*, 4 U.S.F.Mar.L.J. 99, 105 (1992) ("The purpose of

the Act was to standardize the regulations applicable to the manufacture of recreational vessels and to establish uniform standards for recreational vessel numbering and safety equipment.").

**5.** Although V.I.P. did not file a brief with this court, at oral argument Mercury's counsel stated that he also represented the interests of V.I.P.

gate the feasibility of requiring guards to prevent underwater propeller accidents, and the Council subsequently appointed a "Propeller Guard Subcommittee." The Subcommittee recommended that "the U.S. Coast Guard should take no regulatory action to require propeller guards," concluding that (1) current propeller guards can be "counterproductive and can create new hazards of equal or greater consequence," (2) no universal design is presently available, making the cost of retrofitting the millions of boats in this country prohibitive, and (3) "the boating public must not be misled into thinking there is a 'safe' device which would eliminate or significantly reduce such injuries or fatalities." *See* Report of the Propeller Guard Subcommittee, at 20–24 (November 7, 1989). The Advisory Council approved the report, and the Coast Guard accepted all of the Subcommittee's recommendations. *See* Letter from Robert T. Nelson, Rear Admiral U.S. Coast Guard, Chief, Office of Navigation and Waterway Services to Mr. A. Newell Garden, Chairman, 1 (February 1, 1990). The Coast Guard's stated position was that "available propeller guard accident data do not support imposition of a regulation requiring propeller guards on motorboats," noting that a guard fitting all types of boats was not then feasible and that the cost of retrofitting millions of boats was a major economic consideration. The Coast Guard agreed to continue to monitor propeller guard accident data and any improvements in propeller guard technology. *Id.*

The crux of Mercury's argument is that the term "law or regulation" in the § 4306 preemption clause encompasses common-law tort claims because jury awards of damages have a regulatory effect by requiring defendant companies to install propeller guards upon threat of liability.[6] Mercury posits that such awards would not only not be "identical" to the Coast Guard's policy decision not to mandate guards or regulations concerning guards, but also would create a direct conflict

with that decision. Moore argues that her claims are expressly preserved under the plain language of the savings clause in § 4311(g).

▪ When determining whether such an express preemption clause indeed preempts state law, we "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Cipollone,* —— U.S. at ——, 112 S.Ct. at 2617 (quoting *Rice,* 331 U.S. at 230, 67 S.Ct. at 1152). The purpose of such a presumption is to provide "assurance that the 'federal-state balance' ... will not be disturbed unintentionally by Congress or unnecessarily by the courts." *Jones v. The Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). This presumption against preemption particularly obtains when, as in this case, state regulation of health and safety matters is involved. *See Hillsborough,* 471 U.S. at 715, 105 S.Ct. at 2376. Mercury contends that the plain language of § 4306 indicates that common law suits not identical to federal regulations are preempted. We recognize that the term "law" can include both common law and statutory law. However, in *Cipollone,* the Supreme Court stated generally that "the presumption against pre-emption might give good reason to construe the phrase 'state law' in a pre-emption provision more narrowly than an identical phrase in another context." —— U.S. at ——–——, 112 S.Ct. at 2620–21. We also recognize that jury awards can have an effect akin to regulation. *See Cipollone,* —— U.S. at ——, 112 S.Ct. at 2620 ("[R]egulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.") (quoting *San Diego Bldg. Trades Council v. Garmon,*

---

**6.** Mercury assumes, of course, that plaintiffs will prevail on their claims that motors without guards were defectively designed. To determine whether a product was defectively designed, the jury must balance the utility of the product against the likelihood and gravity of injury from its use. *Turner v. General Motors Corp.,* 584

S.W.2d 844, 851 (Tex.1979). Our holding that Moore's claim is not preempted does not prevent either party from presenting its own evidence of the technological and economic feasibility of a propeller guard. *See Boatland of Houston, Inc. v. Bailey,* 609 S.W.2d 743, 746 (Tex.1980).

359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959)). However, this regulatory effect is not as direct as that of positive enactments. *See Goodyear Atomic Corp. v. Miller,* 486 U.S. 174, 185–86 n. 8, 108 S.Ct. 1704, 1712–13, 100 L.Ed.2d 158 (1988) (stating that Congress may reasonably determine in a given case that the "incidental regulatory pressure" of state common-law actions is acceptable when direct state regulatory authority is not); *English v. General Elec. Co.,* 496 U.S. 72, 85, 110 S.Ct. 2270, 2278, 110 L.Ed.2d 65 (1990) (holding that the regulatory effect of petitioner's state common-law claims was "neither direct nor substantial enough" to place them within the preempted field). We conclude that the precepts that preemption clauses must be narrowly construed and that Congress' intent to preempt must be "clear and manifest" counsel us to decline to read "law or regulation" so broadly as to include state common-law claims. *See English,* 496 U.S. at 79, 110 S.Ct. at 2275; *see also* Alan J. Lazarus et al., *Products, General Liability, and Consumer Law: Annual Survey of Recent Developments,* 28 TORT & INS.L.J. 354, 365–66 (1993) ("The lessons of *Cipollone* are that the preemption defense will be applied narrowly, that preemptive language of a statute or regulation will be interpreted strictly, and that few state-law damage claims will be preempted.").

An additional factor militating against reading the term "law or regulation" so broadly is that in other enactments Congress has explicitly referred to state common law when it meant to include it within the scope of a preemption clause. *See, e.g.,* Domestic Housing and International Recovery and Financial Stability Act, 12 U.S.C. §§ 1715z–17(d), –18(e) (1989) (preempting any "State constitution, statute, court decree, common law, rule, or public policy"); Copyright Act of 1976, 17 U.S.C. § 301(a) (1977) (preempting rights "under the common law or statutes of any State"); Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1144(a), (c)(1) (1985) (preempting all state "laws, decisions, rules, regulations, or other State action having the effect of law").

The existence of the savings clause also buttresses our construction of § 4306. Section 4306 must be read in conjunction with § 4311(g).[7] Section 4311(g) demonstrates not only that Congress knew how to explicitly refer to common law when it so desired, but also that Congress did not mean to preempt all state tort law actions under § 4306. Mercury urges that we read § 4311(g) narrowly to expressly preserve common-law claims based only on state regulations and statutes that are identical to federal ones. *See Shields v. Outboard Marine Corp.,* 776 F.Supp. 1579, 1582 (M.D.Ga.1991). Such a construction would render the savings clause redundant, because even assuming that § 4306 applies to common-law actions, it would not bar an action establishing a standard "identical" to a federal standard. Mercury also urges that § 4311(g) preserves claims concerning safety areas which the federal government has not addressed. While this reading is more plausible, we find no basis in the language of the statute or legislative history for such a narrow construction.[8]

---

7. In *Cipollone,* the Court construed the phrase "requirement or prohibition under state law" in the Federal Cigarette Labeling and Advertising Act's preemption clause to include some common law claims. —— U.S. at ——, 112 S.Ct. at 2621. The statute at issue in *Cipollone,* however, did not contain a savings clause; consequently the Court had "no 'good reason to believe' that Congress meant less than what it said." *Id.* at ——, 112 S.Ct. at 2620. The Court also based its broad reading of the clause's language on the legislative history of the Act: when Congress amended the Act in 1969 it added "obviously broader language" that "extended ... [the] preemptive reach" of the original preemption clause. *Id.* at ——, 112 S.Ct. at 2621.

8. Similarly, we reject the reasoning behind the court of appeals' distinction of *Mulhern v. Outboard Marine Corp.,* 146 Wis.2d 604, 432 N.W.2d 130 (Wis.Ct.App.1988), and *Rubin v. Brutus Corp.,* 487 So.2d 360 (Fla.Dist.Ct.App.1986). The court read these cases as holding that § 4311(g) prevents a manufacturer from using compliance with the minimum safety standards set forth in the Federal Boat Safety Act as a defense against liability for defectively designed safety products that are "actually installed." 852 S.W.2d at 845–46. Such a reading of § 4311(g) is not consistent with the court of appeals' determination that "law or regulation" includes common-law actions. If common-law actions are encompassed by § 4306, then tort actions like those in *Rubin* and *Mulhern* would

Our holding that preemption should not be lightly inferred in this case rests in part on the significant state interest at issue. The State of Texas has a decided interest in providing compensation and relief for its citizens who are injured on its waterways. This interest is particularly acute because the Federal Boat Safety Act does not provide compensatory remedies. *Cf. Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 251, 104 S.Ct. 615, 623, 78 L.Ed.2d 443 (1984) (stating that the lack of evidence of congressional intent to bar state common-law remedies "takes on added significance in light of Congress' failure to provide any federal remedy for persons injured by such conduct").[9] Given this state interest, Congress must demonstrate its intent to preempt such remedies in clear and certain terms. *See Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L.Ed.2d 576 (1981) ("Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law."); *Bethlehem Steel Co. v. New York State Labor Relations Bd.*, 330 U.S. 767, 780, 67 S.Ct. 1026, 1033, 91 L.Ed. 1234 (1947) (Frankfurter, J., separate opinion) ("Any indulgence in construction should be in favor of the States, because Congress can speak with drastic clarity whenever it chooses to assure full federal authority, completely displacing the States.").

Mercury urges that a jury award in this case will conflict with and undermine the goals of the Act by creating a standard requiring propeller guards, in the face of the Coast Guard's policy determination that guards should not be mandated. Mercury points to cases holding that the failure to regulate can have the same preemptive effect as a decision *to* regulate. *See, e.g., Transcontinental Gas Pipe Line Corp. v. State Oil & Gas Bd.*, 474 U.S. 409, 422, 106 S.Ct. 709, 716, 88 L.Ed.2d 732 (1986); *Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 384, 103 S.Ct. 1905, 1912, 76 L.Ed.2d 1 (1983). We recognize this potential for conflict, but do not think it justifies a holding of preemption.[10] It is arguable that the Coast Guard's decision that propeller guards should not be *regulated* does not reflect an intention to foreclose state tort liability. First, as noted above, the regulatory effect of damage awards is not equivalent to that of positive enactments: a manufacturer who incurs tort liability for failing to install propeller guards has a choice not available to the regulated manufacturer—installing guards on future boats or taking no action and bearing the liability as a cost of doing business. *See Goodyear*, 486 U.S. at 185–86, 108 S.Ct. at 1712–1713 (stating that the defendant "may choose to disregard" the safety

still create standards not "identical" to federal regulations.

**9.** The Federal Boat Safety Act provides for civil penalties to be paid to the federal government and permits the Attorney General to file suits seeking an injunction. *See* § 4311(a)–(f).

**10.** In this respect, Mercury's argument resembles an implied preemption argument. In *Cipollone*, the Court specifically limited its preemption analysis to examination of the express preemption clause in the Cigarette Labeling and Advertising Act. *See Cipollone*, —— U.S. at ——, 112 S.Ct. at 2618 ("When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a 'reliable indicium of congressional intent with respect to state authority,' ... 'there is no need to infer congressional intent to pre-empt state laws from the substantive provisions' of the legislation."); *see also CSX Transp., Inc. v. Easterwood*, —— U.S. ——, ——, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993) ("If the statute contains an express preemption clause, the task of statuto-

ry construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.").

After *Cipollone*, a number of federal circuit courts have questioned the propriety of an implied preemption analysis when presented with an express preemption clause. *Myrick v. Freuhauf Corp.*, 13 F.3d 1516, 1521–22 (11th Cir. 1994); *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir.1993); *Worm v. American Cyanamid Co*, 5 F.3d 744, 747 (4th Cir.1993); *Kinley Corp. v. Iowa Utils. Bd.*, 999 F.2d 354, 358 (8th Cir.1993); *Stamps v. Collagen Corp.*, 984 F.2d 1416, 1420 (5th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 86, 126 L.Ed.2d 54 (1993); *Cleveland v. Piper Aircraft Corp.*, 985 F.2d 1438, 1447 (10th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993); *American Agric. Movement, Inc. v. Board of Trade*, 977 F.2d 1147, 1154 (7th Cir.1992); *Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818, 823 (1st Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 974, 122 L.Ed.2d 129 (1993).

For purposes of this discussion, however, we address Mercury's implied preemption claims.

standards imposed by state tort law and pay damages as they are awarded). Second, the Propeller Subcommittee Report mentions that manufacturers have been sued for not installing propeller guards, and recognizes that a federal requirement of propeller guards would establish a prima facie case of manufacturer liability in some states. *See* Report of the Propeller Guard Subcommittee, at 4–5. Thus even if the Coast Guard made a policy determination, carrying preemptive weight, that propeller guards should not be regulated, its preemptive effect would not necessarily include state common law.

In addition, we believe that the savings clause reflects that Congress was willing to tolerate some tension between the concept that uniform safety regulations should be established at the federal level and the concept that a state may nevertheless award tort damages for unsafe products. *Cf. Silkwood*, 464 U.S. at 256, 104 S.Ct. at 625. While uniformity is indeed one of the goals of the Act, it is not to be obtained at all costs, as evidenced by the exception for non-identical state standards when necessary to meet "uniquely hazardous conditions" within the state. *See* § 4306; *see also* 1971 U.S.C.C.A.N. at 1341. The broad language of § 4311(g), while not free from ambiguity, directs that Moore's claims be preserved.

We recognize that our holding conflicts with the four courts that have considered the preemption of state law tort actions based on the failure to install propeller guards. *See Shield v. Bayliner Marine Corp.*, 822 F.Supp. 81, 84 (D.Conn.1993); *Shields v. Outboard Marine Corp.*, 776 F.Supp. 1579, 1581 (M.D.Ga.1991); *Mowery v. Mercury Marine*, 773 F.Supp. 1012, 1017 (N.D.Ohio 1991); *Farner v. Brunswick Corp.*, 239 Ill. App.3d 885, 180 Ill.Dec. 493, 607 N.E.2d 562, 567 (Ct.1992); *but see Mulhern*, 432 N.W.2d at 135 (holding that in suit against manufacturer for defective throttle which met federal standards, § 4306 does not expressly or impliedly preempt state tort claims because the

Act and regulations are "only *minimum* safety standards which do not provide private tort remedies"); *Rubin*, 487 So.2d at 363 (in suit against manufacturer for defective seat that met federal standards, rejecting idea that the Act "is intended to be the exclusive basis for a boat manufacturer's liability for damages under maritime or civil law").[11]  However, in light of the Supreme Court's apparent turn to stricter preemption analysis, *see supra* note 10, we do not find their reasoning persuasive. *See also* Anderson & Famulari, *supra* note 4, at 105 (arguing that the Coast Guard regulations are minimum standards, leaving room for state common-law claims requiring additional or stricter safety measures or equipment).

We hold that Moore's state law tort claims are not preempted by the Federal Boat Safety Act. Therefore we reverse the judgment of the court of appeals and remand the cause to the trial court for further proceedings.

PHILLIPS, Chief Justice, dissenting, joined by HIGHTOWER and HECHT, Justices.

I respectfully dissent. Although I agree that state law tort claims based on the failure to install a propeller guard are not expressly preempted by the Federal Boat Safety Act, I believe that they are impliedly preempted. Therefore, I would affirm the judgment of the court of appeals.

Because state jury damage awards can have an indirect regulatory effect, we must examine whether Moore's claim that the boat was defectively designed because it lacked a propeller guard is nevertheless impliedly preempted because it conflicts with the purposes of the Act and its regulatory scheme. *See Cipollone v. Liggett Group, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2608, 2620, 120 L.Ed.2d 407 (1992) ("[R]egulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of

---

11. We also note that the Alabama courts have entertained suits like the instant one under Alabama tort law, although without expressly addressing the issue of preemption. *See Veal v. Teleflex, Inc.*, 586 So.2d 188 (Ala.1991); *Beech v.* *Outboard Marine Corp.*, 584 So.2d 447 (Ala. 1991); *Elliott v. Brunswick Corp.*, 903 F.2d 1505 (11th Cir.1990), *cert. denied*, 498 U.S. 1048, 111 S.Ct. 756, 112 L.Ed.2d 776 (1991) (applying Alabama law in a diversity suit).

governing conduct and controlling policy." (quoting *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959))). Moore concedes that judicial imposition of liability for failing to install propeller guards may force manufacturers to install such guards. She candidly concedes as well that the decision to install guards may also expose manufacturers to liability. Either consequence is merely "what we have juries for," she contends; since the Coast Guard has not passed a regulation on the subject of propeller guards, there is no conflict with federal law.

To me, this argument does not accord proper significance to the Coast Guard's affirmative decision to leave this area unregulated. As the Supreme Court has repeatedly held, "a federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much pre-emptive force as a decision *to* regulate." *Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission,* 461 U.S. 375, 384, 103 S.Ct. 1905, 1912, 76 L.Ed.2d 1 (1983) (emphasis in original); *Transcontinental Gas Pipe Line Corp. v. State Oil & Gas Board,* 474 U.S. 409, 422, 106 S.Ct. 709, 716, 88 L.Ed.2d 732 (1986); *Puerto Rico Department of Consumer Affairs v. Isla Petroleum Corp.,* 485 U.S. 495, 503, 108 S.Ct. 1350, 1355, 99 L.Ed.2d 582 (1988); *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 151–52, 109 S.Ct. 971, 977–78, 103 L.Ed.2d 118 (1989); *see also Toy Manufacturers of America, Inc. v. Blumenthal,* 986 F.2d 615, 621–22 (2d Cir.1992);

*Baltimore & Ohio Railroad Co. v. Oberly,* 837 F.2d 108, 115 (3d Cir.1988).

This principle applies here because the Coast Guard made a *policy* decision that a regulation mandating propeller guards is not warranted at this time. *See Puerto Rico,* 485 U.S. at 503–04, 108 S.Ct. at 1355 (explaining that the quoted language is not meant in an unqualified sense, but rather only applies where a "comprehensive federal scheme *intentionally* leaves a portion of the regulated field without controls") (emphasis added); *cf. Arkansas Electric,* 461 U.S. at 384, 103 S.Ct. at 1912 (holding that this principle did not apply on the facts because the federal agency did not determine "as a matter of policy" that the given area should be left unregulated); *Toy Manufacturers,* 986 F.2d at 622 (denying preemptive effect to a federal decision not to regulate warning labels, where the agency had made no judgment about the efficacy of or need for a warning label requirement). In this case, the Coast Guard, in addition to adopting the Subcommittee's recommendation that it take "no regulatory action to require propeller guards,"[1] specifically stated that propeller guards should not be mandated because of the lack of a feasible universal propeller guard and the economic costs that would attend any such requirement. Letter from Robert T. Nelson, Rear Admiral, U.S. Coast Guard, Chief, Office of Navigation Safety and Waterway Services to Mr. A. Newell Garden, Chairman, NBSAC, at 1 (February 1, 1990). Allowing a jury to impose damages on a manufacturer in this context would in effect create a safety standard in direct conflict with the Coast Guard's determination that manufacturers should not be required to install propeller guards[2] and

---

[1] The Subcommittee concluded that (1) current propeller guards can be "counter-productive and can create new hazards of equal or greater consequence," (2) no universal design is presently available, making the cost of retrofitting the millions of boats in this country prohibitive, and (3) the "boating public must not be misled into thinking there is a 'safe' device which would eliminate or significantly reduce such injuries or fatalities." *See* National Boating Safety Advisory Council [NBSAC], Report of the Propeller Guard Subcommittee, at 22–24 (Nov. 7, 1989). In a section of the report entitled "Key Points Covered by Verbal Input and Written Materials," the Subcommittee notes that a number of lawsuits have been filed against manufacturers for failure to install propeller guards. *Id.* at 4. However,

the Subcommittee expresses no opinion on the viability of such suits, and the Coast Guard letter adopting the Subcommittee's recommendations does not refer to such litigation.

[2] Moore argues that the Subcommittee's investigation, while extensive, was not exhaustive, and implies that some of the evidence and expert testimony considered by the Subcommittee actually militated against preemption. Moore contends that a "fact issue" exists concerning the feasibility of propeller guards. However, for purposes of ascertaining the preemptive effect of the Coast Guard's determination that a propeller guard requirement would not be desirable, this Court's estimation of the wisdom of such a decision is irrelevant.

with the Act's goal of uniformity of safety standards. Thus, while Moore's claims are not expressly preempted by § 4306, they are impliedly preempted based on the specific policy decision of the Coast Guard and the policy of uniformity embraced by the Act.

The language of the savings clause complicates, but does not alter, this conclusion. Under implied preemption review, courts do not apply the same presumption against preemption as under express preemption review. *See Felder v. Casey,* 487 U.S. 131, 138, 108 S.Ct. 2302, 2306, 101 L.Ed.2d 123 (1988) (" '[T]he relative importance to the State of its own law is not material when there is a conflict with a valid federal law,' for 'any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.' " (quoting *Free v. Bland,* 369 U.S. 663, 666, 82 S.Ct. 1089, 1092, 8 L.Ed.2d 180 (1962))); *Taylor v. General Motors Corp.,* 875 F.2d 816, 826 (11th Cir.1989), *cert. denied,* 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990) ("[I]n contrast to the strong presumption against preemption that we apply in determining whether the language of a federal statute or regulation expressly preempts state law, no such presumption is applicable in deciding whether state law conflicts with federal law, even where the subject of the state law is a matter traditionally regarded as properly within the scope of the states' rights."). In such circumstances, federal courts have not read a savings clause to eviscerate the federal statute. In *International Paper Company v. Ouellette,* the Supreme Court declined to presume that Congress intended to undermine its own statute through a general savings clause. 479 U.S. 481, 494, 107 S.Ct. 805, 813, 93 L.Ed.2d 883 (1987); *see Morales v. Trans World Airlines, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2031, 2037, 119 L.Ed.2d 157 (1992) ("As in *International Paper Co. v. Ouellette,* 'we do not believe Congress intended to undermine this carefully drawn statute through a general

saving clause.' " (citation omitted)); *Cleveland v. Piper Aircraft Corp.,* 985 F.2d 1438, 1443 n. 11 (10th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993) ("[T]he [Supreme] Court has limited a savings clause if it presents 'an irreconcilable conflict between the statutory scheme and the persistence of common-law remedies,' ... or if it would 'undermine [a] carefully drawn statute.' " (citations omitted)); *Buzzard v. Roadrunner Trucking, Inc.,* 966 F.2d 777, 780–81 n. 6 (3d Cir.1992) ("A savings clause ... does not preserve state common law actions that subvert federal law.") (citing *Ouellette); Pokorny v. Ford Motor Co.,* 902 F.2d 1116, 1125 (3d Cir.), *cert. denied,* 498 U.S. 853, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990) ("[I]t is well-established that a savings clause ... does not 'save' common law actions that would subvert a federal statutory or regulatory scheme."); *Wood v. General Motors Corp.,* 865 F.2d 395, 416 (1st Cir. 1988), *cert. denied,* 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 782 (1990) ("*Ouellette* belie[s] the supposed principle that a general savings clause precludes a court from looking into implied preemption."); *see also Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 328–31, 101 S.Ct. 1124, 1135–37, 67 L.Ed.2d 258 (1981) (where state common-law action was plainly contrary to the purposes of the federal statute, Court was "not free to assume" that such action had been preserved). Nothing in the legislative history of the Act evinces any intent to allow state law claims that clash with the purposes of the Act and its regulatory scheme.[3]

Implied preemption review is foreclosed *only* where an express preemption clause "provides a 'reliable indicium of congressional intent with respect to state authority.' " *Cipollone,* —— U.S. at ——, 112 S.Ct. at 2618 (quoting *Malone v. White Motor Corp.,* 435 U.S. 497, 505, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443 (1978)); *see Toy Manufacturers,* 986

---

3. Thus this case is distinguishable from *Silkwood v. Kerr–McGee Corporation,* 464 U.S. 238, 256, 104 S.Ct. 615, 625, 78 L.Ed.2d 443 (1984), where the Court held that state tort damages for nuclear safety violations did not conflict with laws vesting the federal government with the exclusive authority to regulate nuclear safety. The Court

found direct evidence in the legislative history of Congress' intent to allow the "tension" between these two principles. It did not lay down a general rule that general savings clauses reflect a congressional sanction of the tension between federal regulation and clashing state products liability law. *See Wood,* 865 F.2d at 413.

F.2d at 623–24; *Worm v. American Cyanamid Co.*, 5 F.3d 744, 747 (4th Cir.1993); *Papas v. Upjohn Co.*, 985 F.2d 516, 517 (11th Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993); *Gills v. Ford Motor Co.*, 829 F.Supp. 894, 897–98 (W.D.Ky. 1993); *Covey v. Surgidev Corp.*, 815 F.Supp. 1089, 1094 (N.D.Ohio 1993); *Burke v. Dow Chemical Co.*, 797 F.Supp. 1128, 1139–40 (E.D.N.Y.1992); *Marrs v. Ford Motor Co.*, 852 S.W.2d 570, 575–76 (Tex.App.–Dallas 1993, no writ); *Boyle v. Chrysler Corp.*, 177 Wis.2d 207, 501 N.W.2d 865, 870–71 (Ct.App. 1993). *But see Stamps v. Collagen Corp.*, 984 F.2d 1416, 1420 (5th Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 86, 126 L.Ed.2d 54 (1993) (holding that existence of express preemption clause precludes reliance on implied preemption doctrine, without determining whether provision constituted a "reliable indicium of congressional intent"); *American Agriculture Movement, Inc. v. Board of Trade*, 977 F.2d 1147, 1154 (7th Cir.1992) ("Only if a statute is devoid of explicit preemptive language may we resort to either variant of implied preemption.").[4] I find no such intent here.

For example, courts have construed a very similar statutory scheme under the National Traffic and Motor Vehicle Safety Act, 15 U.S.C. § 1381 *et seq.* ["NTMVSA"], as effecting preemption. Section 1392(d) of that Act, entitled "Supremacy of federal standards," provides:

Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard. Nothing in this section shall be construed as preventing any State

from enforcing any safety standard which is identical to a Federal safety standard.

Section 1397(k), entitled "Continuation of common law liability," provides:

Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law.

Four circuit courts have considered the preemptive effect of NTMVSA on state common-law suits against auto manufacturers for failing to install air bags. *See Buzzard v. Roadrunner Trucking, Inc.*, 966 F.2d 777 (3d Cir.1992); *Pokorny v. Ford Motor Co.*, 902 F.2d 1116 (3d Cir.), *cert. denied,* 498 U.S. 853, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990); *Taylor v. General Motors Corp.*, 875 F.2d 816 (11th Cir.1989), *cert. denied,* 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990); *Kitts v. General Motors Corp.*, 875 F.2d 787 (10th Cir.1989), *cert. denied,* 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990); *Wood v. General Motors Corp.*, 865 F.2d 395 (1st Cir.1988), *cert. denied,* 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 782 (1990). As did the Coast Guard with respect to propeller guards, Congress and the Secretary of Transportation made a conscious decision not to mandate air bags at the time of these cases. Thus, under the regulations manufacturers were given the choice to install either air bags *or* seat belts. *See Pokorny,* 902 F.2d at 1123; *Wood,* 865 F.2d at 399. After determining under an express preemption review that § 1392(d) and § 1397(k), taken together, did not indicate an unmistakable intent to preempt state tort claims, see *Wood,* 865 F.2d at 401; *Pokorny,* 902 F.2d at 1121; *Taylor,* 875 F.2d at 825; *Kitts,* 875 F.2d at 789, these courts all held the Act to be facially ambiguous as to whether Congress meant to preserve state tort claims that had the effect of conflicting with the

---

4. This language in *Cipollone* reaffirms the standard principle that "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Norfolk & Western Railway Co. v. American Train Dispatchers' Ass'n,* 499 U.S. 117, 128, 111 S.Ct. 1156, 1163, 113 L.Ed.2d 95 (1991) (quoting *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. at 2781, 81 L.Ed.2d 694 (1984)); *see also Gills,* 829 F.Supp. at 897 ("The Supreme Court [in *Cipollone*] broke no new ground with that discussion."). It is axiomatic that Congress may fail to clearly and unambiguously express its intent in a preemption clause.

regulatory scheme. *See Wood*, 865 F.2d at 401 ("The difficulty arises because section 1392(d) (the preemption clause) and section 1397(c) (the savings clause) send conflicting messages in these particular circumstances.").[5] Therefore, they proceeded to an implied preemption review,[6] and determined that damage awards based on a failure to install air bags would actually conflict with the Act because they had the effect of creating an air bag requirement, in contravention of the federal desire not to prematurely mandate air bags.[7]

A similar conclusion is warranted in this case. State court damage awards would effectively require boat manufacturers to install propeller guards, in direct contravention of the expressed federal policy against mandating such devices.[8] As the Court concedes, a finding of implied preemption essentially

comports with the holdings of the few courts that have decided this precise issue, although some of these courts appear to have arrived at a determination of preemption using an express preemption analysis. *See Shield v. Bayliner Marine Corp.*, 822 F.Supp. 81, 84 (D.Conn.1993); *Shields v. Outboard Marine Corp.*, 776 F.Supp. 1579, 1581 (M.D.Ga.1991); *Mowery v. Mercury Marine*, 773 F.Supp. 1012, 1017 (N.D.Ohio 1991); *Farner v. Brunswick Corp.*, 239 Ill.App.3d 885, 180 Ill. Dec. 493, 498, 607 N.E.2d 562, 567 (1992); *see also Toy Manufacturers of America, Inc. v. Blumenthal*, 806 F.Supp. 336, 345–46 (D.Conn.), *aff'd*, 986 F.2d 615 (2d Cir.1992) (expressing agreement, in dicta, with the holding of *Mowery* ); Thomas A. Russell & Mitchell F. Ducey, *Current Topics in the Law of Recreational Boating*, 5 U.S.F.MAR.L.J. 107, 119 (1992) ("As the

**5.** Section 1397(c) was redesignated as § 1397(k) in a 1988 amendment to the NTMVSA.

**6.** A panel of the Eleventh Circuit recently reexamined the preemption analysis it employed in *Taylor*, in light of the Supreme Court's decision in *Cipollone*. *See Myrick v. Freuhauf Corp.*, 13 F.3d 1516 (11th Cir.1994). The court held that under *Taylor*, the NTMVSA did not expressly preempt a state tort law action alleging that a tractor-trailer was negligently designed because it lacked anti-lock brakes. *Id.* at 1521. In a 2 to 1 decision, the court declined to engage in implied preemption analysis on the grounds that §§ 1392(d) and 1397(k) provided a reliable indicium of congressional intent. *Id.* at 1525.

**7.** In her brief and at oral argument, Moore repeatedly relies on *Dorsey v. Honda Motor Company*, 655 F.2d 650, 654 (5th Cir.1981), *cert. denied*, 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982), as holding that air bag cases are not preempted under federal law. However, Moore misconstrues *Dorsey*. *Dorsey* did not involve a failure to install air bags. Moreover, the court's discussion focused on whether under Florida law compliance with federal regulations precluded a finding of recklessness justifying an award of punitive damages, not whether compliance meant such claim was preempted. *Id.* at 656–57. The Fifth Circuit has expressly recognized that the exact issue posed in *Wood* et al. remains undecided by that court. *See Perry v. Mercedes Benz of North America, Inc.*, 957 F.2d 1257, 1265 (5th Cir.1992).

While some lower court cases hold that air bag or other passive restraint tort claims are not preempted, see, for example, *Garrett v. Ford Motor Co.*, 684 F.Supp. 407, 412 (D.Md.1987); *Murphy v. Nissan Motor Corp. in U.S.A.*, 650 F.Supp.

922, 929 (E.D.N.Y.1987); *Gingold v. Audi–NSU–Auto Union*, 389 Pa.Super. 328, 567 A.2d 312, 315 (1989), the clear weight of authority supports the opposite position. *See Gardner v. Honda Motor Co.*, 145 A.D.2d 41, 536 N.Y.S.2d 303, 304, 304 n. 2 (1988) (pointing to the "great weight of judicial authority upholding a finding of preemption" in this context); *Gingold*, 567 A.2d at 315 (acknowledging that its holding places it in the minority of courts regarding this issue); Beverly L. Jacklin, Annotation, *Federal Pre-Emption of State Common–Law Products Liability Claims Pertaining to Motor Vehicles*, 97 A.L.R.FED. 853 § 5 (1990 & 1993 Supp.).

**8.** I reject Moore's assertion that these cases are distinguishable because they involved an actual federal regulation that placed an affirmative obligation on manufacturers. As discussed above, a federal decision to forgo regulation can have as much preemptive effect as a federal regulation. *See Arkansas Electric*, 461 U.S. at 384, 103 S.Ct. at 1912. Moreover, these cases focused on the fact that the motor vehicle regulations were meant to provide manufacturers with a "choice." *See Taylor*, 875 F.2d at 827. The Coast Guard's decision not to mandate propeller guards reflects a similar desire to provide manufacturers with a choice in this area. *See Mowery v. Mercury Marine*, 773 F.Supp. 1012, 1016 (N.D.Ohio 1991).

I acknowledge that § 1392(d) is arguably less broad than § 4306, because § 1392(d) expressly leaves open to state regulation those areas of motor safety not actually regulated by the federal government. However, such a distinction does not affect the validity of the analogy between the issue in the instant case and the issue involved in *Wood* et al., since those cases did not concern areas unregulated by the federal government.

*Shields* court indicated, it is essential for the sake of uniformity of decision in this area that all courts, federal and state, apply federal law to cases of injuries resulting from propellers.").[9]

Concluding that Moore's claims are impliedly preempted does not leave her without any possibility of recovery. Persons in Moore's situation would still be free to sue the owners and operators of the boat for negligence. *See* S.REP. No. 248, 92d Cong., 1st Sess. § 10 (1971), *reprinted in* 1971 U.S.C.C.A.N. 1333, 1341 ("Th[is] section [on federal preemption] does not preempt state law or regulation directed at safe boat operation and use, which was felt to be appropriately within the purview of state or local concern."). Even without a propeller guard, persons are unlikely to suffer serious injuries in the absence of some negligent conduct, either by themselves or someone else. *See* NBSAC, Report of the Propeller Guard Subcommittee, at 23 (Nov. 7, 1989) ("Operator error is clearly a significant factor in the vast majority of underwater impacts which result in injuries/fatalities.").

I believe Moore's claims that the boat was defective because it lacked a propeller guard are impliedly preempted by the Federal Boat Safety Act. Accordingly, I would affirm the judgment of the court of appeals.

---

9. Alabama courts have applied state products liability law to suits based on the failure to install propeller guards. *See Veal v. Teleflex, Inc.*, 586 So.2d 188, 191 (Ala.1991) (holding that under Alabama tort law there is no cause of action for failure to install propeller guards on pleasure boat outboard motors); *Beech v. Outboard Marine Corp.*, 584 So.2d 447, 450 (Ala.1991) (same); *Elliott v. Brunswick Corp.*, 903 F.2d 1505, 1510 (11th Cir.1990), *cert. denied*, 498 U.S. 1048, 111 S.Ct. 756, 112 L.Ed.2d 776 (1991) (in a diversity suit, holding that the defendant was not liable under Alabama law for failing to install a propeller guard). However, none of these cases considered the preemption issue, and I would therefore decline to follow them.