# IN THE SUPREME COURT OF TEXAS

═══════════
No. 19-0662
═══════════

IN RE ONCOR ELECTRIC DELIVERY COMPANY LLC, RELATOR

═══════════════════════════════════
ON PETITION FOR WRIT OF MANDAMUS
═══════════════════════════════════

CHIEF JUSTICE HECHT, joined by JUSTICE BOYD and JUSTICE BLACKLOCK, dissenting.

The Public Utility Regulatory Act (PURA) gives the Public Utility Commission (PUC) "exclusive original jurisdiction over the rates, operations, and services of an electric utility".[1] Just three years ago, in *Oncor Electric Delivery Co. v. Chaparral Energy, LLC*, this Court unanimously held that when an electric utility is sued for damages for breach of contract for "failing to timely provide electricity services" the PUC has exclusive jurisdiction to determine, as a matter of law, what service was required.[2] Today, in another Oncor case as it happens, the Court holds that when an electric utility is sued for damages for negligence in "continuing the placement of [its] service line . . . through trees"[3] the PUC has no jurisdiction whatever to determine, as a matter of law, what service was required. *When* an electric utility should run power lines—the issue in *Chaparral Energy*—and *where* it should run power lines—the issue in the present case—both directly involve the utility's operations and services under PURA. There is no material difference between *when*

---

[1] TEX. UTIL. CODE § 32.001(a). PURA does not allow the PUC to regulate municipally owned or regulated utilities. *Id.* § 32.002.

[2] 546 S.W.3d 133, 136, 141 (Tex. 2018).

[3] Plaintiff's Second Amended Petition 12.

and *where*. The question in both *Chaparral Energy* and this case is the same: when an electric utility is sued over its operations and for breach of its legal duty to provide services, does the court or the PUC determine in the first instance what that duty is? In *Chaparral Energy*, the Court held that the electric utility's legal duty to its customer could only be determined by the PUC, not by the courts. In this case, the Court holds that the electric utility's legal duty to its customer cannot be determined by the PUC but must be determined by the courts.

The Court should either follow *Chaparral Energy* or overrule it. But an errant departure from indistinguishable precedent is not the most serious fault in today's decision. Its premise, expressed throughout, is that personal-injury lawsuits are virtually irrelevant to utility regulation. That has not been the Court's position. We recognized many years ago that "jury awards can have an effect akin to regulation."[4] We cited the U.S. Supreme Court's acknowledgment that "regulation can be as effectively exerted through an award of damages as through some form of preventive relief", such as direct, administrative regulation.[5] "The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy."[6] The Legislature intended that "PURA would comprehend all or virtually all pertinent considerations involving electric utilities operating in Texas"[7] in order "to protect the public interest".[8] In this case the Court gives judges, juries, and damages awards a role in electric-utility regulation that the Legislature has given exclusively to the PUC.

I respectfully dissent.

---

[4] *Moore v. Brunswick Bowling & Billiards Corp.*, 889 S.W.2d 246, 249 (Tex. 1994).

[5] *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959).

[6] *Id.*

[7] *In re Entergy Corp.*, 142 S.W.3d 316, 323 (Tex. 2004).

[8] TEX. UTIL. CODE § 31.001(a).

2

# I

## A

The Court dismissively characterizes this case as a "tree-trimming suit" having nothing to do with Oncor's operations and services. That characterization cannot be squared with plaintiff James Stacey Taylor's pleadings.

"Oncor provided electricity to the neighborhood" in which Taylor and his brother owned a rental house.[9] "Oncor ran a main high-voltage power line . . . to a utility pole at the corner of the Taylors' property".[10] "Oncor then ran electricity" to both the Taylors' house and the house behind it "using service lines off the main high voltage line."[11] "The service line to [the Taylors' house] runs a short distance from the pole to the house."[12] The service line to the neighbors' house "runs from the same utility pole through trees and across the Taylors' property".[13] "Both the main high-voltage line and the neighbor's service line ran through the overgrown trees that were located on the Taylor property."[14] "Over time, trees located in Oncor's right-of-way grew up, into, and all around the main high-voltage line, the secondary power line, and the neighbors' service line, causing the neighbors to complain that the overgrown trees were creating power outages in their service."[15] "[T]he Taylors and their neighbors were suffering serious problems because the trees were growing up, into, and around both the main high-voltage power line, secondary power line,

---

[9] Plaintiff's Second Amended Petition 3.

[10] *Id.* at 3–4.

[11] *Id.* at 4.

[12] *Id.*

[13] *Id.*

[14] *Id.* at 6.

[15] *Id.* at 1.

and the neighbors' service line."[16] Taylor repeatedly called Oncor to "move the neighbors' service line off the Taylor property."[17] "Oncor had control of the service line and the trees that interfered with it, and it was necessary and feasible to properly maintain the trees and/or move the service line."[18] "Oncor finally did that very thing . . . —moved the service line—after yet another incident where the trees damaged the neighbors' service line and almost caused a fire at the neighbors' house."[19] But that was only after Taylor trimmed the trees himself and, in doing so, came too close to the high-voltage line and was electrocuted.[20]

Taylor asserts that "Oncor was negligent in the placement of and/or continuing the placement of the service line that ran across the Taylor property, through trees, to the neighbor" and "should have moved [it] when asked".[21] "Oncor," his pleadings continue, "had a non-delegable duty to exercise ordinary care and properly maintain its power lines yet refused to do so".[22] Taylor asserts negligence, premises liability, misrepresentations by Oncor that trimming the trees was not

---

[16] *Id.* at 7. Contrary to the Court's assertion, *ante* at 3 n.6, Taylor explicitly alleges that both he and his neighbors were "suffering serious problems" with their electrical service, the neighbors because of the trees near their service line, and both Taylor and the neighbors because of the trees near the main line that serviced them both.

[17] Plaintiff's Second Amended Petition 10.

[18] *Id.* at 11.

[19] *Id.* at 11–12.

[20] A person is statutorily prohibited from working within specified distances of a high-voltage overhead line without notifying "the operator of the line at least 48 hours before the work begins", TEX. HEALTH & SAFETY CODE § 752.003(a); "negotiat[ing] a satisfactory mutual arrangement to provide temporary de-energization and grounding" or other safety measures, *id.* § 752.003(b); and "pay[ing] the operator of the high voltage overhead line the actual expense incurred" in making the arrangements, *id.* § 752.003(c). A violation is a Class B misdemeanor, *id.* § 752.007; TEX. PENAL CODE § 12.41(2), and renders the violator liable to the operator for all liability it incurs as a result, TEX. HEALTH & SAFETY CODE § 752.008. Taylor admits that he violated these provisions but argues that he is excused because Oncor "forced" him to cut his trees and did not inform him of his statutory obligations.

[21] Plaintiff's Second Amended Petition 12.

[22] *Id.* at 13.

4

its responsibility, but his, and violations of the Deceptive Trade Practices Act.[23]

Taylor's claims are not merely about "tree-trimming". They have nothing to do with aesthetics. Nor do they complain of an injury unrelated to electric service, like a passerby hit by a falling limb. Taylor's complaint is not that the trees were unattractive or unhealthy or that they might fall on him or someone else. Taylor's complaint is that by running its lines through the trees and not moving them, Oncor threatened the continued, safe, dependable electric service to his house and his neighbors'. The Court acknowledges that Taylor alleges "Oncor was negligent in placing its utility line" yet denies that his allegation involves Oncor's operations and services.[24] Taylor repeatedly asserts that trimming the trees was one solution but that another was moving the lines out from among the limbs. Anyone could trim the trees. Only Oncor could move its lines. They were essential to providing electric service to the Taylors and their neighbors. One may argue that some of Taylor's claims are not so closely tied to Oncor's services, such as his allegations of misrepresentations and DTPA violations. But his claim that trees interfered with the power lines and had to be trimmed or the lines moved, whether asserted as negligence or premises liability, is firmly based on Oncor's provision of electric service to the property. Determining the duty Oncor owed Taylor was therefore within the PUC's exclusive original jurisdiction, as Oncor argued in its plea to the jurisdiction.

---

[23] TEX. BUS. & COM. CODE §§ 17.41–17.63.

[24] *Ante* at 16.

**B**

In *Chaparral Energy*, Chaparral alleged the following. Oncor agreed, at Chaparral's request, to "provide electricity to two wells Chaparral had recently drilled".[25] Oncor had to "construct new facilities to deliver electricity from its existing facilities to a 'tie-in' point from which Chaparral could construct facilities to transmit the electricity to the wells."[26] Oncor represented that "it could complete its work within about ninety days, possibly even sooner."[27] The parties' Service Agreement "provided that 'the start date of this project [would] be no earlier than two weeks preceding the execution of this agreement' and that Oncor would provide a 'more definitive installation schedule'", but Oncor never did.[28] "Several weeks later, when Chaparral inquired about the project's status, Oncor explained that it was having difficulty obtaining easements it needed to construct the new facilities across privately owned land."[29] But "Oncor did not even attempt to obtain all of the necessary easements until several months later."[30] Once it had acquired the easements, "Oncor then finished constructing the new facilities in two days. Meanwhile, Chaparral allegedly spent over $300,000 to rent generators and purchase diesel fuel to provide the necessary power to the wells."[31]

Chaparral asserted that Oncor breached its contract and "did not cooperate in good faith to fulfill its duties and obligations" or "act in a manner consistent with good business practices,

---

[25] *Oncor Elec. Delivery Co. v. Chaparral Energy, LLC*, 546 S.W.3d 133, 136 (Tex. 2018).

[26] *Id.*

[27] *Id.*

[28] *Id.* at 136–137.

[29] *Id.* at 137.

[30] *Id.*

[31] *Id.*

reliability, safety, and expedition".[32] Chaparral sought as damages the expenses for generators and fuel it incurred in supplying electricity to its wells while waiting for Oncor to connect them to its power lines. The jury found for Chaparral. On appeal, Oncor "moved to dismiss Chaparral's claim for want of jurisdiction, arguing for the first time that the PUC ha[d] exclusive jurisdiction to resolve Chaparral's allegations."[33]

This Court agreed: "[B]ecause Chaparral's breach-of-contract claim in this case complains of Oncor's services, we conclude that the scope of the PUC's exclusive jurisdiction encompasses that claim."[34] While the PUC could not award Chaparral damages, that did not deprive the agency of all jurisdiction. Chaparral, the Court explained, could seek damages "in the district court *after* the PUC has exercised its exclusive jurisdiction" to determine Oncor's legal duty to Chaparral.[35] Those issues involved the applicability of Oncor's regulatory tariff to Chaparral's breach-of-contract claim, a matter squarely within the PUC's authority.[36] The Court had "described this two-step process"—of going first to the PUC, then to court—"in *David McDavid Nissan*".[37] "Under this 'hybrid claims-resolution process,' the agency must first exercise its exclusive jurisdiction and apply its unique expertise to resolve the issues that fall within its exclusive jurisdiction."[38] Then after exhausting its administrative remedies to obtain the agency's decision on those issues, which

---

[32] *Id.*

[33] *Id.*

[34] *Id.* at 141.

[35] *Id.* at 142.

[36] *Id.*

[37] *Id.* (citing *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 222, 224 (Tex. 2002)).

[38] *Id.*

would be subject to substantial-evidence review in the courts,[39] the claimant could "rely on those findings to establish its claim and obtain relief in the courts."[40] The Court rejected the applicability of the inadequate-remedy exception to the PUC's exclusive jurisdiction, reasoning that Chaparral's claims raised issues properly within the PUC's purview and that a ruling from the PUC on those issues would advance the ultimate outcome of the litigation.[41]

The Court also rejected Chaparral's constitutional objections[42] based on the rights to trial by jury[43] and to open courts.[44] The Court concluded that "requiring the PUC to first make underlying determinations *within its expertise* before Chaparral can seek recourse through the judicial system does not deprive Chaparral of its right to a jury trial nor of its constitutional guarantee of open courts."[45] The Court dismissed Chaparral's suit for lack of jurisdiction for not having first exhausted its administrative remedies before the PUC. The Court observed that "[a]lthough the heart of this case is a simple contract dispute, it necessarily involves questions of rules and regulations squarely within the PUC's purview."[46]

---

[39] TEX. UTIL. CODE § 15.001.

[40] *Chaparral Energy*, 546 S.W.3d at 142.

[41] *Id.* at 141–142.

[42] *Id.* at 143–144.

[43] TEX. CONST. art. I, § 15 ("The right of trial by jury shall remain inviolate."); *id.* art. V, § 10 ("In the trial of all causes in the District Courts, the plaintiff or defendant shall, upon application made in open court, have the right of trial by jury . . . .").

[44] *Id.* art. I, § 13 ("All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.").

[45] *Chaparral Energy*, 546 S.W.3d at 145 (emphasis added).

[46] *Id.*

## II

## A

As noted at the outset, PURA gives the PUC "exclusive original jurisdiction over the rates, operations, and services of an electric utility".[47] PURA states that it was "enacted to protect the public interest inherent in the rates and services of electric utilities" and "to establish a comprehensive and adequate regulatory system for electric utilities to assure rates, operations, and services that are just and reasonable".[48] "[T]he statutory description of PURA as 'comprehensive' demonstrates the Legislature's belief that PURA would comprehend all or virtually all pertinent considerations involving electric utilities operating in Texas. That is, PURA is intended to serve as a 'pervasive regulatory scheme'".[49] Consistent with that intent, PURA defines *service* to have "its broadest and most inclusive meaning."[50] PURA does not define *operations*, so the word must be given its ordinary meaning consistent with the statutory context,[51] which is "a doing or performing of a practical work".[52] Because "rates" and "services" relate to an electric utility's function as a utility, "operations" should as well.[53]

*Chaparral Energy* should decide this case. Both cases involve common-law causes of action—breach of contract in *Chaparral Energy* and tort claims here—and common-law damages

---

[47] TEX. UTIL. CODE § 32.001(a).

[48] *Id.* § 31.001(a); *In re Entergy Corp.*, 142 S.W.3d 316, 323 (Tex. 2004).

[49] *Entergy*, 142 S.W.3d at 323 (citing *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 223 (Tex. 2002)).

[50] TEX. UTIL. CODE § 11.003(19).

[51] *See Sunstate Equip. Co. v. Hegar*, 601 S.W.3d 685, 689–690 (Tex. 2020).

[52] *Operations*, WEBSTER'S THIRD NEW INT'L DICTIONARY (1969).

[53] *Aleman v. Tex. Med. Bd.*, 573 S.W.3d 796, 815 (Tex. 2019) (explaining the *noscitur a sociis* canon as requiring that "when words 'are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar'").

9

claims.[54] In neither case could the PUC grant the plaintiff full relief: damages. In both cases, the PUC could decide as a legal matter what duty its regulation of an electric utility imposes under the circumstances. The answer might be a duty peculiar to the regulatory scheme applicable to the particular utility—based on its tariff, for example—or it could be the same duty as imposed by the common law generally. Either way, there would be regulatory ramifications. When the plaintiff has exhausted his administrative remedies, he may proceed in court. For the reasons explained at length in *Chaparral Energy*, this two-step, hybrid dispute-resolution process, first approved by the Court nearly 20 years ago, preserves both the PUC's exclusive jurisdiction and a plaintiff's right to a jury trial.[55] The legal issues for the PUC would never be for a jury, and the factual disputes for a jury would never be for the PUC. The Court goes so far as to argue that this process would abrogate rights in dereliction of the common law. But *Chaparral Energy* rejected that very argument in a lengthy discussion.[56] The hybrid process *Chaparral Energy* describes cannot abrogate common-law tort rights when it does not abrogate common-law contract rights.

**B**

The Court argues that this is merely a personal-injury case having nothing to do with utility regulation. But as quoted above, Taylor's allegations are replete with detailed complaints that "Oncor was negligent in the placement of and/or continuing the placement of the service line that ran across [his] property, through trees, to the neighbor" and "should have moved [it] when asked".[57] Taylor's complaints relate directly to Oncor's operations and services. Today's decision

---

[54] As noted above, Taylor also asserts DTPA violations and claims statutory damages.

[55] *Oncor Elec. Delivery Co. v. Chaparral Energy, LLC*, 546 S.W.3d 133, 142–145 (Tex. 2018) (citing *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 222 (Tex. 2002)).

[56] *Id.* at 143–144.

[57] Plaintiff's Second Amended Petition 12.

ignores what the Court has long known: that "jury awards can have an effect akin to regulation."[58] Damages recovered in a lawsuit "can be, indeed [are] designed to be, a potent method of governing conduct and controlling policy."[59] Taylor claims actual, punitive, and statutory damages for his severe injuries. Whether he wins or loses, Oncor and every other electric utility in Texas will have to take note. They will have to decide whether to alter their placement and maintenance of electric lines and poles, or not. The PUC might decide that the common-law duty of care applies here, just as it might have decided in *Chaparral Energy* that a utility contracting to provide electric service must do so within a reasonable time, as the common law would require of nonutility service providers. Courts *could* decide those duty questions for utilities as they do for nonutilities. But the Legislature has chosen to ensure comprehensive regulation of electric utilities for the public good by giving the PUC jurisdiction to decide their legal duties related to operations and services to the exclusion of judges and juries.

The Court asserts that the PUC, in its own words, "does not have jurisdiction to adjudicate private tort or contractual disputes between parties."[60] But the assertion is a strawman. No one argues to the contrary. *Chaparral Energy* holds that the PUC can resolve legal issues in a contract case prefatory to its final judicial adjudication. And the PUC has acknowledged that while it lacks "the authority to make common-law determinations", its regulatory determinations "might inform a court on aspects of claims within the court's jurisdiction".[61] On behalf of the State as amicus curiae, the Solicitor General, whose views the Court called for in this case, argues strongly that

---

[58] *Moore v. Brunswick Bowling & Billiards Corp.*, 889 S.W.2d 246, 249 (Tex. 1994).

[59] *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959).

[60] *Ante* at 15.

[61] Tex. Pub. Util. Comm'n, Order at 1–2, *Complaint of Giovanni Homes Corp. Against Oncor Elec. Delivery Co.*, Docket No. 45854 (July 18, 2019), 2019 WL 3642716.

the process laid out in *Chaparral Energy* should apply in the present case.[62] And in fact, the PUC has exercised its jurisdiction over a complaint that "Oncor unreasonably abused its discretion when conducting tree trimming activities".[63]

Taylor argues that tort cases are categorically excepted from the PUC's exclusive jurisdiction. While the Court seems to regard the argument approvingly, it never quite endorses it. Instead, it reiterates that courts adjudicate tort cases. Of course they do. And courts could adjudicate issues relating to an electric utility's rates, operations, and services. But the Legislature has determined that these issues are exclusively within the PUC's jurisdiction, as *Chaparral Energy* confirms, and as the State insists in this case.

The Court argues that PURA's plain words are "misleadingly broad"[64] and should be limited by the statute's regulatory purpose, which is not invoked by Taylor's claims. Even accepting the limitation as valid—the Court acknowledged in *Chaparral Energy* that "[a]ll regulatory schemes have limit[s]"[65]—it has no more effect here than the Court gave it there. The Court acknowledges that Chaparral's claim—that Oncor's delay in providing electric service to Chaparral's wells breached their contract—involved Oncor's services and was within the PUC's exclusive jurisdiction. It dismisses Taylor's suit as a mere tree-trimming claim, having nothing to do with utility regulation. But Taylor's pleadings clearly and repeatedly complain not only that Oncor would not trim the trees away from its lines, but that Oncor placed its lines in the trees and

---

[62] Brief of the State of Texas as Amicus Curiae 13–14.

[63] Tex. Pub. Util. Comm'n, Order at 5–7, *Complaint of Kenneth M. Jasinski Against Oncor Elec. Delivery Co.*, Docket No. 44853 (Dec. 4, 2015), 2015 WL 8536654; *see also* Tex. Pub. Util. Comm'n, Preliminary Order at 5–6, *Complaint of Jaime Leonardo Sloss Against AEP Tex. Inc.*, Docket No. 50284 (Apr. 17, 2020), 2020 WL 1973315 (determining that the PUC had "exclusive jurisdiction" to make findings regarding electric-utility operations and services underlying tort claims).

[64] *Ante* at 7.

[65] *Oncor Elec. Delivery Co. v. Chaparral Energy, LLC*, 546 S.W.3d 133, 139 (Tex. 2018).

would not move them.

The Court does not address Taylor's argument that *Chaparral Energy*'s holding should be limited to contract disputes over "business affairs". Taylor points to Section 52.002(a), which gives the PUC "exclusive original jurisdiction over the business and property of a telecommunication utility in this state",[66] and to cases interpreting that statute.[67] The statutory grant of PUC jurisdiction over an electric utility, by contrast, contains no mention of "business and property." Nor does Section 32.001(a) contain any other language from which the limiting principle Taylor advances could be derived. Instead, Section 32.001(a)—without any reservations or qualifications relevant here—gives the PUC "exclusive original jurisdiction over the rates, operations, and services of an electric utility".[68] "When the Legislature uses certain language in one part of the statute and different language in another, the Court assumes different meanings were intended."[69] There is no basis for imposing a "business affairs" limitation on the PUC's exclusive jurisdiction under Section 32.001(a).

Oncor argues that its tariff governs and does not impose a legal duty as Taylor asserts.[70] In

---

[66] TEX. UTIL. CODE § 52.002(a).

[67] *See Lynn v. Hous. Lighting & Power Co.*, 820 S.W.2d 57, 58 (Tex. App.—Houston [14th Dist.] 1991, no writ) (applying PURA's telecommunications provisions to electric utilities); *Dolenz v. Sw. Bell Tel. Co.*, 730 S.W.2d 44, 44 (Tex. App.—Houston [14th Dist.] 1987, no writ) (construing statutory language awarding the PUC "exclusive original jurisdiction . . . over the business and property of all telecommunications utilities in this state"); *Calarco v. Sw. Bell Tel. Co.*, 725 S.W.2d 304, 306 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n r.e.) (same); *Sw. Bell Tel. Co. v. Reeves*, 578 S.W.2d 795, 798 (Tex. Civ. App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.) (same), *overruled in part by Hous. Lighting & Power Co. v. Auchan USA, Inc.*, 995 S.W.2d 668, 671, 675 (Tex. 1999) (refraining from analyzing jurisdiction over the tort claim because plaintiff abandoned the claim).

[68] TEX. UTIL. CODE § 32.001(a).

[69] *Ineos USA, LLC v. Elmgren*, 505 S.W.3d 555, 564 (Tex. 2016) (quoting *DeWitt v. Harris Cnty.*, 904 S.W.2d 650, 653 (Tex. 1995)) (cleaned up).

[70] Chapter 5 of Oncor's tariff, titled "Service Rules and Regulations Relating to the Provision of Delivery Service to Retail Customers," provides Oncor's duties to its customers. For instance, section 5.2.1, governing "Liability Between Company and Retail Customers," limits Oncor's liability for its failure to properly or promptly relocate its facilities. Section 5.4.5, entitled "Provisions for Company Facilities and Equipment and the Meter," is a

the trial court, Taylor contended that Oncor's alleged tree-trimming duty, a lynchpin of his claims, arose from Oncor's PUC tariff.[71] Taylor now contends that the tariff does not control, and the Court agrees. But the Court correctly notes that "limitations of liability in a tariff do not necessarily 'transform Plaintiffs' complaint into one about [the utility's] operations or services as a utility'",[72] quoting a second case the Court decides today with this one, *In re Texas-New Mexico Power Co.*[73] Accordingly, whether or not Oncor's tariff controls this case does not affect my analysis.

Oncor's plea to the jurisdiction should have been granted in part to allow the parties to seek the PUC's decision regarding the application of its regulatory scheme to Taylor's claims. Once the PUC has decided issues within its exclusive jurisdiction, then Taylor may prosecute his case in the trial court in light of the PUC's determinations.[74]

\*      \*      \*      \*      \*

---

specific provision regarding easements. And section 5.7, regarding "Facilities Extension Policy," governs the relocation of retail customers' facilities, when Oncor must complete the relocation, and who constructs and pays for the relocation. While nothing in the tariff speaks directly to tree-trimming responsibilities, Taylor contended in the trial court that the tariff allocated those duties to Oncor, and Oncor disagreed.

[71] *See, e.g.*, Plaintiff's Response in Opposition to Defendant's No-Evidence and Traditional Motion for Summary Judgment at 15 ("But Oncor's tariff with the State of Texas makes clear Oncor was responsible for maintaining pole-to-house power lines."); *id.* at 16 ("According to Oncor's own tariff, Retail Customers like the Taylors and their tenant are not responsible for maintaining Oncor's pole-to-house lines because those lines are part of Oncor's Delivery System." (citing Oncor's tariff §§ 5.4.5, 5.4.6, and 5.4.8)); *id.* ("Texas law [found in the tariff] gave Oncor an unequivocal legal right to trim the trees around the pole-to-house service lines that ran across the Taylors' property. And section 5.4.6 of Oncor's tariff implies the Taylors were actually prohibited from performing tree trimming around Oncor's power lines."); *id.* at 17 ("Contrary to . . . its tariff with the State of Texas . . . , Oncor repeatedly told the Taylors it was their responsibility to trim trees around pole-to-house power lines.").

[72] *Ante* at 13 n.43.

[73] ___ S.W.3d ___, ___ (Tex. June 25, 2021) (No. 19-0656).

[74] Either party may challenge the PUC's decision under the substantial-evidence rule. *See Oncor Elec. Delivery Co. v. Chaparral Energy, LLC*, 546 S.W.3d 133, 142 (Tex. 2018); *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 224 (Tex. 2002).

PURA's pervasive regulatory scheme—giving the PUC exclusive jurisdiction over matters involving rates, operations, and services—requires the PUC to "make certain findings before a trial court may finally adjudicate a claim."[75] Allowing conflicting court rulings about the application of "rules and regulations squarely within the PUC's purview" would frustrate PURA's pervasive regulatory scheme and interfere with the exclusive jurisdiction vested in the PUC by the Legislature.[76] As we have said before:

> The requirement that parties exhaust administrative remedies does not deprive parties of their legal rights. Instead, it honors the Legislature's intent that "the appropriate body adjudicates the dispute" first and thereby "ensure[s] an orderly procedure to enforce those rights." By requiring the agency to address the complaints first, the law permits the agency to apply its expertise and exercise its discretion to resolve the issue and to develop a complete factual record if the courts later get involved. A party who obtains relief through the administrative process avoids the expense and delay of litigation. And if the outcome of the administrative process leaves the party dissatisfied, it may file suit and have the courts review the agency's decision.[77]

Today's decision irreconcilably conflicts with *Chaparral Energy* and impedes the pervasive regulatory scheme established by the Legislature in PURA. I respectfully dissent.

_____
Nathan L. Hecht
Chief Justice

**OPINION DELIVERED:** June 25, 2021

---

[75] *Chaparral Energy*, 546 S.W.3d at 142 (Tex. 2018) (quoting *David McDavid Nissan*, 84 S.W.3d at 221).

[76] *Id.* at 145.

[77] *Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, at 544–545 (Tex. 2016) (citations omitted).